[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 171 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 172 
But two questions are presented for our consideration on this appeal: I. Whether the creditors of the non-resident debtors residing out of the State of New York, are entitled to share or participate rateably with those creditors residing within this State, in the distribution of the fund in the hands of the trustees. II. Whether the creditors, citizens and residents of the Kingdom of France, who became parties to the proceedings had there on the failure of the non-resident debtors, or were bound by those proceedings, or who have participated in the dividends declared and paid under and in pursuance of them, have thereby forfeited or lost the right to participate or share in the funds held by the trustees in this State. It will be most convenient to consider these questions in the order they are presented.
The provision of our statutes regulating the proceedings of the assignment of the estates of non-resident, absconding, insolvent or imprisoned debtors, are found in chapter V, title I, article I, part II, of the Revised Statutes (2 R.S., p. 3). Title I, is subdivided into eight articles. Article I treats of the attachment against absconding, concealed and non-resident debtors. Article II, of attachments against debtors confined for crimes. Article III, of voluntary assignments made pursuant to the application of an insolvent and his creditors. Article IV, of proceedings by creditors, to compel assignments by debtors, imprisoned on execution in civil causes. Article V, of voluntary assignments by an insolvent, for the purpose of exonerating his person from imprisonment. Article VI, of voluntary assignments by a debtor imprisoned in execution in civil causes. Article VII, general provisions applicable to proceedings under the several preceding articles, or some of them. And article VIII, of the powers, duties and obligations of trustees and assignees under this title. *Page 173 
In proceedings under the first article, the application for the attachment can only be made by a creditor residing within this State, or by a creditor residing elsewhere, upon a contract made in this State, or upon a judgment rendered within this State, or upon a judgment rendered in another State upon a contract made in this State. (§§ 1-3, p. 3.) Such demand, if the application is made by one creditor, must amount to $100 or upwards; if by two, to $150 or upwards, and if by three to $200 or upwards. (§ 3.) Section 37 (p. 8) provides, that after such application shall have been made, any other creditor, of such debtor, having a demand against such debtor, whatever may be its amount, may file with the officer who issued the attachment, an affidavit specifying the amount of such indebtedness, and a petition stating the desire of such creditor to be deemed an attaching creditor. And section 38 (p. 9) declares, that upon filing such affidavit and petition, such creditor shall in all respects be deemed to be an attaching creditor, and entitled to the same benefits and advantages, and subject to the same responsibilities and obligations as the creditor who originally procured the attachment. By section 54 (p. 11) it is provided, that every debtor against whom any warrant of attachment shall have been issued, may, at any time before the appointment of trustees as therein provided, apply to the officer issuing the warrant to discharge the same. And by section 55, as amended (p. 12), upon such application such debtor or his agent is required to execute, and deliver to the officer, a bond to the creditors prosecuting the attachment, in a penal sum double the amount of the debts sworn to by such creditors, with such sureties as shall be approved of by the officer, conditioned that they will pay to each attaching creditor the amount justly due and owing by such debtor to him, when he became an attaching creditor, on account of any debt so claimed and sworn to by him, with interest; and if given in a proceeding against a non-resident debtor, it shall also contain a condition, if anything was due to such creditor, the said debtor will pay to every such creditor the costs and disbursements incurred in obtaining such attachment and the proceedings thereon. Section 56 (p. 12) *Page 174 
provides, that upon such bond being executed and delivered, the said officer shall thereupon discharge such warrant of attachment.
From the preceding provisions it is apparent that the application for the warrant of attachment could only be made by a resident of this State, or by a non-resident having a demand which arose within this State. The first restriction has been enlarged by a subsequent section of article seventh of the same title (§ 9, 2 R.S., p. 36), which provides, that creditors residing out of this State and within the United States, may petition and unite in any petition, in the same manner as resident creditors, under either of the preceding articles. It is therefore incontrovertible, that the application for an attachment may be made by any creditor residing within the United States having a demand of the requisite amount. And the language of the statute is equally plain, that after the attachment has been issued, any other creditor, without any qualification as to residence or the amount of his demand, may come in and avail himself of the benefits of the attachment, and put himself in all respects in as favorable position as the original attaching creditor. We thus perceive that the legislature, for reasons doubtless entirely satisfactory, placed restrictions and qualifications upon those who might initiate within this State the proceedings against non-resident debtors. The restrictions imposed were that the attaching creditor should be a resident within the United States, and that the amount due by the debtor to the attaching creditor, or creditors unitedly, should be of the amount specified in the statute. But no such restriction as to residence, or limitation as to amount, is found in the provision permitting any other creditor of such debtor to come in and avail himself of the benefits of the attachment. The legislature have thrown the door as wide open as possible, by declaring that any other creditor, whatever may be the amount of his demand, may participate in the benefits of the attachment.
This view is, I think, greatly strengthened by the other provisions of the statute. Section 58 (p. 12) declares, that if *Page 175 
the debtor, against whom the attachment has been issued, shall not appear and satisfy his creditors (that is, those who may have made themselves parties to the proceedings against him), and if the warrant shall not have been discharged, the officer, at the expiration of three months from the time limited by the notice required to be given, shall nominate and appoint three trustees for all the creditors of such debtor. The powers, duties and obligations of the trustees are prescribed in article 8 of said title. (2 R.S., p. 39.) By subdivision 8, of section 7, they are to settle all matters and accounts between such debtor, and his debtors or creditors; and by section 8, immediately upon their appointment, they shall give notice thereof, and require (by sub. 3) all the creditors of such debtor to deliver their respective accounts and demands to the trustees, or one of them.
Section 19 provides, that if any controversy shall arise between the trustees or any other person in the settlement of any demands against such debtor, the same may be referred as therein provided. Section 27 declares, that within fifteen months from the time of their appointment, the trustees shall call a general meeting of the creditors of such debtor, and section 28 enacts that at such meeting, all accounts and demands, against the estate of the debtor, shall be fairly adjusted, and the amount of moneys in the hands of the trustees declared. Section 33 provides, that the trustees shall distribute the money in their hands, among all those who shall have exhibited their claims as creditors, and whose debts have been ascertained, pro rata; and the only qualification or restriction as to those to whom payment is thus to be made, is contained in subdivision 1 of this section, which declares that the payment or distribution is to be among those who were creditors at the time of issuing the first warrant of attachment.
By section 41, it is provided that any creditor who shall have neglected to deliver to the trustees an account of his demand, before the first, second, third or other dividend, and shall deliver it before the second or other dividend, shall receive the sum he would have been entitled to on any former dividend, before any distribution to other creditors. *Page 176 
This examination of the provisions of the statutes cannot fail to carry conviction to the mind, that if the legislature intended to exclude creditors residing without the United States, from participating in the distribution of the assets of their debtor seized by virtue of this act, they omitted to give expression to such intention. The language used conveys precisely and distinctly the opposite idea. We have already seen, that any creditor having a demand to any amount may come in and have the full benefit of the proceeding, in the same manner as if he had been originally the attaching creditor. The trustees, when appointed, are the trustees for all the creditors of the debtor. How can they be trustees for all, when we are asked to say that `all' means only a certain class, and that class is to be determined by locality? In many instances, the exclusion of all creditors, who only were competent to initiate the attachment proceeding, would operate to the full payment of the attaching creditor, and the return to the debtor of perhaps, a large portion of his estate; and the great bulk of his creditors would have to stand idly by and witness the statute wrested to the perpetration of a great wrong. "All the creditors of such debtor" must be held to mean just what its language imports.
Again, the trustees are to settle all matters and accounts between such debtor and his creditors. Not, as it is argued, between the debtor and such of his creditors as reside within the United States. Such a settlement could not be of all matters and accounts between the debtor and his creditors. In many cases, upon this construction, it must necessarily be of a very small fraction.
The trustees are to require all the creditors of the debtor to deliver to them their respective accounts and demands against the debtor. It seems superfluous to argue that all the creditors does not mean all — every one, located anywhere, having a demand against the debtor. The statute says the trustees shall give the notice requiring all the creditors of the debtor to deliver to them their respective demands. The creditors, in compliance with this requirement of the trustees, deliver in their respective demands, and then the trustees, instead of doing *Page 177 
what the law requires — adjust and settle these claims — are called upon to institute an inquiry as to the residence of the respective creditors, and the claims of all such as reside out of the limits of the United States are to be rejected. Surely, if the legislature had intended this they would have said the notice should be to the creditors residing within the United States, and not to all the creditors of the non-resident debtor. It is unnecessary to say, that no warrant for such a proceeding is found in the statute, and, to the honor of our legislature be it said, that no language used by them can be perverted to work such injustice.
Again, the trustees are to call a general meeting of the creditors of the debtor, at which all accounts and demands against the debtor are to be adjusted. How could the meeting be general if it is to be confined to a particular class, those only of a particular locality, and perhaps few in number? One of the definitions of the word general, is, common to many or the greatest number. Another is, having a relation to all, common to the whole. (Webst. Dict.) At this meeting all accounts and demands against the debtor which have been presented to the trustees are to be adjusted. The direction of the statute is not confined to those accounts and demands due and owing to residents of the United States, but to all, meaning the whole, the accounts of all who claimed to be creditors. The only restriction, as before observed, which the legislature in terms have thought proper to place upon the claims of the creditors, who are to participate in the dividend, is that the payment is to be among those who were creditors at the time the first attachment was issued. Expressio unius est exclusio alterius, is a sound and familiar maxim, and its application may with great propriety be here invoked. We find a further provision that any creditor, who shall have neglected to deliver in his account in time for the first or any other dividend, does not by such neglect lose his right to participate in the fund, but may come in. It is any creditor, who is thus protected by the statute — not the creditor of any particular class or locality, but any creditor of the debtor. It seems to me, that it is therefore clear beyond *Page 178 
any serious doubt, that the legislature did not intend to confine the creditors who were to come in and share in the distribution of the debtor's estate, found and attached within this State, to those who may be residents of this State or of the United States.
What just motives of public policy would induce a legislature to adopt such a rule of action? It is well known that located in this State is the great commercial city of the Union, where is transacted business with foreigners to the amount of millions annually. Persons engaged in importations from Europe often have all the debts owing by them due to persons residing there, and the whole estate of the debtor is located here. The property represented by their debts finds its way here, and such a state of things exists as that it may be subject to attachment, the debtor being absent, absconding or concealed. He may owe debts here, contracted outside of his business, as surety, or otherwise, and the creditor residing here takes the property by virtue of his attachment, and appropriates it exclusively to the payment of his debt, in full; and the foreign creditor, who has parted with his property, never having received a cent for it, is to stand quietly by and see it thus appropriated, and such a wrong perpetrated. The establishment of such a principle would be a fatal blow to the commercial prosperity of our great city, to its commercial honor and integrity; would be revolting to the moral sense of our business community. I have no little gratification in finding that the laws of this State do not compel this court to lend its sanction or its aid to such flagrant injustice. Equality is equity; a just and equal distribution of the assets of a debtor, is what these statutes contemplate, and what is consistent with all our notions of honor and justice. The State does not lend its process or its power to seize the property of absent debtors for the exclusive benefit of our own citizens. It takes charge of it, in the first instance, to preserve it for creditors, and to compel the debtor to appear here and liquidate their demand. If he does not do it within such time as the law deems reasonable, then competent and proper persons are appointed to take *Page 179 
charge of the attached property, and convert it into money, and make just and equal division and distribution thereof among his creditors. The law makes the same disposition of the estates of intestates found within this State. They are administered upon, and the debts, if any, owing by the intestate, are paid without any reference to the residence of the creditor.
It is to be inferred from an examination of the reports of the revisers, when submitting chapter V to the legislature, that their attention was called to the fact that only a certain class of creditors might initiate the attachment, or become attaching creditors, while the language used in the Revision of 1813, and that used by them, permitted all the creditors to participate in the distribution of the funds realized from the attached estate. By section 23 of the act for relief against absconding and absent debtors (1 R.L., p. 183), every debtor who resided out of this State, and was indebted within it, was rendered liable to have his property attached. In commenting upon this statute, the Supreme Court, in Fitzgerald's case (2 Caines, 318), who was an absent debtor, and the attachment had been taken out by a creditor residing abroad, say: "The 23d section confines this remedy to the estates of debtors who reside out of this State and are indebted within it. By this mode of expression we understand that the debt must be due to a person residing within the State, and not to a stranger who may be here transiently. It is very well to give our own citizens a remedy over the property of their absent debtors, but it would be harsh and impolitic to extend this remedy to strangers, who might pursue the property here for the sole purpose of seizing it, and by this means drive its owner to a settlement on very unequal terms, or compel him to litigate in a distant forum, when perhaps both the parties, residing near each other, ought possibly to be left to apply to the tribunals of their own country." This case was decided in 1805.
In 1826 the case of Caldwell, an absconding debtor, came before the Supreme Court. (5 Cow., 293.) He fled from his creditors in Paisley, Scotland, and came to the city of New *Page 180 
York, where he concealed himself. A creditor from Scotland came here and took out an attachment against him as an absconding debtor. It was moved to supersede it, on the ground that foreign creditors were not within the statute, and the case of Fitzgerald, an absent debtor, was cited to sustain the motion. But the court denied the motion, holding that the court, in deciding that case must have overlooked the 20th section of the act of 1813 (1 R.L., p. 162), which declared that any creditor residing out of this State should be deemed a creditor within the act, and that his attorney might act for him in the same manner as if he were personally present.
The next case which came before the Supreme Court, was that ofex parte Schroeder (6 Cow., 603), an absent debtor. His property was attached at the instance of a creditor residing in Hamburg, and the attachment was superseded on the ground that Shroeder never having been within this State, was not indebted within this State.
The revisers, in submitting their report to the legislature, in their revision of these acts say, in reference to section first (which was enacted in the precise words as drawn by them), that it embraces sections 1 and 23 (1 R.L., p. 157), and was drawn to conform to the decision in 6 Cowen, 603. These words of the section were reported in italics: "On a contract made within this State, or to a creditor residing within this State although upon a contract made elsewhere," and in reference to them, the revisers say, "The words in italics are new, and are intended to express the meaning of the legislature distinctly, as it seems to be understood in 5 Cowen, 293, and the cases there cited. (Vol.III, Revisers' Notes, ch.V, p. 1.) The 3d section of article I embraces the provisions of section 20, of 1 Revised Laws, page 162, which authorizes the application to be made by any creditor, resident within this State or out of it. We see then that the revisers have retained the law precisely as they found it expounded by the Supreme Court. First. In the case of an absconding or concealed debtor being an inhabitant of this State, the application for the attachment might be made by any creditor resident within this State or *Page 181 
out of it, or by his personal representatives. Second. In the case of an absent or non-resident debtor, the application may be made by any creditor, resident within this State or out of it, if the debtor is indebted on a contract made within this State, or the applicant be a creditor residing within this State, although the indebtedness arose on a contract made elsewhere. These provisions are in conformity with the views expressed by the Supreme Court in the case of Fitzgerald, already quoted, and were doubtless intended to give legislative sanction to them. But it is to be observed as a significant fact that the revisers, in submitting what is now the 37th section of article I, after the words, "any other creditor of such debtor," had this clause: "Who might according to the foregoing provisions have made suchapplication." These words were erased by the legislature, and the following, now standing in the section, were substituted in their place: "Having any demand against such debtor then due, whatever may be its amount." (Vol. III, Revisers' Notes, ch. V, p. 11.) These facts furnish us with controlling evidence of the intention of the legislature, in making these enactments. They clearly indicate, and without doubt for the reasons suggested by the Supreme Court in Fitzgerald's case, that in the case of an absent or non-resident debtor, an absent or non-resident creditor should not come into this State, where the contract of indebtedness had not been made, and attach the absent non-resident's property. The revisers, for the reasons suggested to their note to sections 39 and 40 (as reported by them §§ 36 and 37, 3 Revisers' Notes, ch. V, p. 11), and to protect the rights of other creditors, drafted these two sections to enable such other creditors to avail themselves of the benefits of an attachment issued against the property of absent debtors. But in their view, they wished to confine the privileges thus conferred to such creditors only as might have originally taken out the attachment, though the language used by them in the subsequent sections, as it is submitted has been already shown, allowed all creditors to participate in the distribution of the property attached. But the legislature interposes its negative to this, and says, true it is we will *Page 182 
not allow non-resident creditors to attach the property of non-resident debtors unless the contract of indebtedness was made within this State, yet it is the settled principle of our laws that the assets of an insolvent should be equally distributed among all his creditors, without reference to their locality or residence. When the property of an insolvent is attached, and taken into the custody of the law, and it proceeds to its administration and distribution, all the creditors shall equally participate therein. To effectuate this, the legislature erased the restriction proposed, which confined the right to become attaching creditors to those only who might have taken out the attachment, and substituted in its place the words "having any demand against such debtor, then due, whatever may be its amount" — words embracing all and every creditor having a demand of any character, without reference to the locality of its contraction. The subsequent provisions of the statute are in harmony with the letter and spirit of this legislative action, and if there could be any reasonable doubt of the proper construction to be given them, I think that doubt is entirely removed by this clear and emphatic expression of the legislative will. I arrive at the conclusion, therefore, that the trustees and the courts below have properly decided, that all the creditors of the non-resident debtors, without reference to their place of residence, were entitled to have their claims and demands allowed by the trustees, and to participate in the distribution of the funds in the hands of the trustees in proportion to their respective demands. Whatever any of them may have received on account of such claims, in France or elsewhere, should be deducted from the dividends to be paid to them here, so that all may be placed on a perfect equality.
The remaining question for consideration is, whether the creditors residing in France, who became parties to the proceedings there by joining in and signing the concordat, or by receiving dividends under it, are precluded from participating and sharing in the distribution of the fund in the hands of the trustees. These persons were creditors of the non-resident *Page 183 
debtors at the time the attachment was first issued, December 10, 1847, and continue such, unless their debts have been discharged by the concordat. On the 30th of November preceding, judgment of failure, under section 440 of the French Code had been pronounced by the Tribunal of Commerce in France, and section 443 of that Code declares, that the effect of that judgment is, that it operates by full right from its date the divestiture of the failed person of the administration of all his property. At this time, pursuant to article 451, a judge commissary was designated, and provisional syndics or assignees, were appointed, who immediately took possession of all the property of the insolvents, and put their seals upon the same, and the persons of the insolvents were then in custody. On the 11th of December, the same persons theretofore designated as provisional, were appointed definite or permanent assignees or syndics, and on the 12th of May, 1848, they made their report to the creditors of the insolvents, assembled pursuant to article 504. In that report, they mention the fact of the attachments issued in this State, on the property of the insolvent debtors. They state that the insolvents were ready to make a proposition to their creditors. By article 504, this meeting is convoked to deliberate on the formation of the concordat, or composition to be made between the insolvent and his creditors; and by article 505, the judge commissary is to preside at the meeting, and the debtor is to be present. At this meeting the insolvents made the proposition, to be entirely acquitted and discharged towards them, the creditors, by making surrender to them of their assets, as well in the States of America as elsewhere, to be sold and liquidated. And the proceedings state that these propositions were accepted by the creditors. In conformity with article 507 of the Code, a concordat or composition was then drawn up, and signed by the creditors, and the insolvents, which contained four articles: The first provided for a surrender and abandonment by the insolvents to their creditors of all their assets, as well in the United States as elsewhere, to be sold and liquidated under superintendence. Article second provided, that the liquidation should be *Page 184 
made by one of the insolvents, whom the creditors thereby made commissioner for that purpose. Article third provided, that the bankruptcy expenses and debts entitled to preference were to be deducted from the assets, and the remainder distributed prorata, among the creditors. Article fourth declared, that as soon as the concordat should have been confirmed, the sentence should be made known to the assignees, who should thereupon give up their accounts to the bankrupts, and the latter should be free in their persons and their property, and consequently an unconditional withdrawal was granted to them of all seals and executions which might have taken place for the things which belonged to them, as well as the inscription required on their goods and real estate by the assignees.
By article 510 of the Code, if the debtor has been condemned, as a fraudulent bankrupt, the concordat cannot be formed. And by article 511, if the failed party has been condemned as a simple bankrupt, the concordat can be formed. By article 512, any creditor can make objections to the concordat, and by article 513, the homologation or confirmation of the concordat shall be heard before the Tribunal of Commerce, and it shall not decide before the expiration of eight days.
By article 516, the homologation or confirmation of the concordat, renders it obligatory on all the creditors named or not named in the balance sheet. By article 518, no action to annul the concordat can be received after the homologation thereof other than for fraud discovered after said homologation. Article 519 provides, that as soon as the judgment of homologation shall be definite, the functions of the syndics shall cease; they shall deliver to the failed person their final account in the presence of the judge commissary, and they shall deliver to the failed person the totality of his assets, books, papers and effects. In this case the homologation, of the concordat formed, was made by the tribunal in conformity with the Code.
It is urged by the counsel for the appellants, that these proceedings in France are equivalent to proceedings under the English bankrupt act, and that thereby the debts of the French creditors, or those who have come in under those proceedings *Page 185 
by receiving dividends by virtue of them, have become discharged. In other words, they have ceased to be creditors of the non-resident debtors, whose property is in the hands of the trustees here for distribution. The effect of proceedings in bankruptcy in England, was settled by this court in the case of Coates Hillard. (Decided, December, 1856.) We then held that the debt of the petitioner in that case was extinguished by the discharge in bankruptcy, and that the creditors affected by those proceedings could not participate in a dividend declared by the trustees of the non-resident debtors here. It was said, that "debtors and creditors were all subjects of Great Britain and domiciled in England, the debt was English in its origin, and the creditors have received the dividend under the English bankruptcy." Under such circumstances, it was held, that the discharge of the debt was valid and to be respected in all other countries, and that the debt was extinguished between the parties. If we find, on examination, that the provisions of the Code of Commerce in France, relating to the bankruptcy of the insolvent debtors, and the concordat entered into between them and their creditors, and confirmed by the judgment of the Tribunal of Commerce, are equivalent to a discharge in bankruptcy, under the English bankrupt act, then we are bound to hold the judgment of the trustees erroneous.
In looking at the concordat, to ascertain what in truth are its terms and what is its legal effect, we are to confine ourselves to the stipulations therein contained. The prior negotiations, conversations or propositions are to be excluded. The concordat was intended to, and in its nature did, cover the whole subject matter of the propositions and communications in reference thereto, and as soon as it was signed it superseded all that had gone before, and constituted the only contract between the parties in reference to the subject matter of it. (Renard v.Sampson, 2 Kern., 561.) We fail to see anything in the Code which authorizes the Tribunal of Commerce absolutely and unqualifiedly to discharge the bankrupt from his debts. The policy of the law would seem to be that, if his *Page 186 
failure is fraudulent, no concordat or composition can be made with his creditors, but he is treated as a criminal, and his property is arrested and taken from him, and applied towards the payment of his debts. I have been unable to find any provision which discharges him absolutely and unqualifiedly from them.
If the failing party has been condemned as a simple bankrupt, then the law permits him to make a concordat or composition with his creditors. The French law does not allow, upon the failure of parties, that they may make private arrangements with their creditors. In harmony with the institutions prevailing there, on the happening of a failure, the government immediately interferes and seizes both the debtor and his effects, and places the latter in charge of temporary syndics. They examine into the circumstances of the failure, and if they find it to have been inevitable and without fraud, then, if the tribunal so adjudges, the insolvent is at liberty to arrange with his creditors, on such terms as shall be to them mutually satisfactory. But so jealous is the government that it watches carefully all the proceedings, and they must be had in the presence of its judicial officers, and be sanctioned by the judgment of its courts. In the present case such a concordat was formed, or agreement of composition entered into, between the insolvent debtors and their creditors, and it is set out in the proceedings before us, and its provisions have already been quoted. I have examined it carefully, and I am unable to find any clause which conveys the idea that the insolvents were by its terms discharged from their debts, or from any portion of them. The only stipulation or agreement on the part of the creditors is, that if the tribunal shall sanction the concordat, and that judgment shall be made known to the syndics, that then they, the syndics, shall give up their accounts to the bankrupts, and the latter shall be free, in their persons and their property. That is, that they shall be discharged from the arrest made at the time of their failure, and the property then taken from them is to be surrendered up to them by the syndics, who since that period have had *Page 187 
it in charge; and at the same time the syndics were to render their accounts to the bankrupts. These stipulations would be necessary to enable the person selected as the commissioner to liquidate the estate, and pay over the proceeds, according to the terms of the concordat, among the creditors. That this is the meaning of the stipulation or agreement is, I think, plain from the words which follow: "Consequently an unconditional withdrawal is granted to them, of all seals and executions which might have taken place for the things which belonged to them, as well as the inscription required on their goods and real estate by the assignees." The creditors, as they might under the law of France, elected to permit the failed person to continue in the possession and control of his estates. He was to administer it, for the purpose of paying off his debts, and it is I think apparent that the question of the ultimate discharge of the debtors was left to await the result of such administration. It was no doubt in the contemplation of both creditors and debtors, that if, at the end of such administration, it should be made satisfactorily to appear to the creditors, that the debtor had faithfully settled up the estate, collected in its assets, and fully paid over all that he received to his creditors, that then they would grant him a discharge for any balance which might remain unpaid. But there was no agreement in the concordat making it obligatory on the creditors to accept the proceeds of the debtor's estate in full of their respective debts, and I think such a stipulation was properly postponed, as a security for the fidelity of the debtor who took upon himself the liquidation of the estate. This view is, I think, fully sustained by the note to section 519 of the Code (see Code Francais Expliqué, p. 57), it says: The concordat, as we have already observed, replaces the failed person at the head of his affairs. It is to him after that, that the syndics are to render their account, as by the events they have become his agents. They should also deliver to him the whole of his goods of which he had been dispossessed, for the concordat operates as a surrender of the property dispossessed. The failed person, by the concordat, finds himself released *Page 188 
from the constraint of his person, and discharged from that portion of his debts, of which a remission has been made to him, but he shall not be able at any time to obtain his rehabilitation, without proving that he has paid in full any sum due by him, principal, interest and costs.
The rehabilitation, or restoration of the debtor to his commercial rights and standing, is provided for by section 604 of the Code. It declares that the debtor who shall have fully discharged the principal, interest and expenses of all debts due by him, shall be able to obtain his rehabilitation; and by section 608, every creditor who shall not have been paid, in full, his debts, in principal, interest and charges, may make opposition to the rehabilitation.
We thus see that a debtor cannot obtain his restoration until his debts are paid in full, even though his creditors may have agreed to remit or discharge them by the concordat, and that if he is discharged from them at all, it must be by the concordat. There is nothing in the Code, that I have been able to find, which operates as such discharge, in either aspect in which the failure is regarded, excusable or non-excusable. If the latter, he is certainly not discharged, from anything I can discover; and if excusable, and the concordat is formed, then it depends upon its terms, whether the debtor is or is not discharged. The note to section 519, already quoted, declares the debtor to be discharged from that portion of his debts, of which a remission has been made to him by the concordat. It follows that if no remission has been made by the concordat, that he is not discharged from any portion of his debts, and he stands in relation to them as if no failure had taken place. Nothing has yet been done, so far as the facts are before us, which warrants the assumption that these debtors had been discharged from any portion whatever of their debts.
These views are not impaired but, I think, strengthened, by the extract furnished by the appellant's counsel from an approved treatise on Failures and Bankruptcies, and it is to be observed that the author makes a distinction between the two. The former seems more in the nature of a suspension, while *Page 189 
the latter speaks the unmistakable language of bankruptcy, total inability to pay one's debts. This author says: "All the debts contracted by the debtor before his failure, are completely extinguished and replaced by the new engagement, which the majority of the creditors have settled upon or determined by the concordat. The failed person is legally liberated from that portion of his debts which have been remitted to him, to thatextent that his subsequently acquired property cannot be taken for payment of them: nevertheless, in the court of conscience he remains a debtor, so long as he has not paid his creditors in full." (Saint Nixent, Traité des Faillites et Banqueroutes,tom. 3, p. 222, Paris, 1843.) It is to be particularly noticed that, according to this author, the existing debts are only extinguished and replaced by the new engagements of the concordat; this must mean the new engagements of the concordat in reference to those debts. We see, on examining this concordat, that it contains no engagement whatever in reference to these debts, and that no portion of them has been released by the creditors. The debtor therefore has not been legally discharged from any portion of his debts, nor have any new engagements been entered into, in reference to these debts or any part of them. Judging from the terms of the concordat, the debtors stand precisely, in reference to them, as if no such instrument had been formed; and I am unable to see, that they have obtained any discharge of their debts or any portion of them, or that their creditors have released or agreed to release them from such debts or any part thereof. In law, and in the court of conscience, they still remain liable for the whole amount of such debts, as the same existed at the time of their suspension, with the exception of such part as has been paid. Such certainly is the condition of the debts due to persons here, who only are parties to the attachment proceedings; and such, I think, is the condition of the French creditors, parties to the concordat.
The appellant's counsel relied with some confidence upon the Case of Quelin v. Moisson. (1 Knapp's Privy Council Cases, 265.) There Quelin had been adjudged a bankrupt by the *Page 190 
Tribunal of Commerce, and obtained a protection from arrest. He was afterwards prosecuted as for a fraudulent bankruptcy, and was condemned as such. The note, on which the action was brought, was proven by the holder under the bankruptcy, and afterwards indorsed to Moisson, who sued Quelin, the maker. He pleaded his bankruptcy in France in bar to the action. The plea was overruled in the court in Jersey, and, on appeal to the Privy Council, two questions were directed to be submitted to two French advocates.First. Whether a person whose property has passed to syndics under the law de la faillité, could afterwards be sued by any creditor who had proved his debts before the syndics. The second question is not important to the point now under consideration. The French advocates answered to the first question, that the bankrupt could not be sued even by a creditor who had not proved his debts before the syndics, and a fortiori could not be sued by one who had. And thereupon the Privy Council reversed the judgment.
It will be seen that that case differs from the present in this that there the bankrupt was divested of his estate, and it passed into the hands of the syndics, and it also differs in the important fact that in that case no concordat was formed or entered into between the debtor and his creditors. It may well be, where the proceedings is wholly adverse to the debtor, and his estate is taken from him, and administered upon by the agents of the law for the benefit of all his creditors, that the latter should be held bound to look to that fund only for the satisfaction of their debts. That is not the present case. Here the debtor and creditors have mutually surrendered the rights and advantages secured to each by the law, and substituted therefor an agreement. The rights of the parties are therefore to be determined by its terms and stipulations, and we have seen, by our examination of them, that no portion of the debts due by the failed debtors have been released, and no agreement made to release them. It is not perceived that the decision of the Privy Council in Quelin v. Moisson, establishes any rule in conflict with the views expressed in this opinion. *Page 191 
The analogy, therefore, which is sought to be established between these proceedings and those under the English bankrupt act, entirely fails. Under the latter the certificate operates as a discharge of any debt, claim or demand which might have been proven under the commission. The debt, by the proceedings, is discharged, wiped out, and the creditor has not, therefore, any debt or demand against the debtor to prove and establish before the trustees. It is true that he once had a debt, but by operation of law it has been discharged and extinguished, and it was upon this ground that this court held, that the creditors of Coates Hillard, who were parties to the proceedings in bankruptcy in England, had ceased to be creditors, and could not therefore come in before the trustees here and participate in a dividend. The decision in Coates Hillard has no application to the present case; and the proceedings in France, and the stipulations of the concordat, present no obstacles to the creditors who were parties thereto, or residing there, from proving their claims and participating in the dividends declared by the trustees in this State. All sums received by them on account of their respective debts or claims in France or elsewhere, are to be credited and allowed as so much received on account of dividends, so that all the creditors may share equally in the distribution of the non-resident debtor's estate.
The order appealed from should be affirmed, with costs.
COMSTOCK, Ch. J., and SELDEN, J., without expressing any opinion as to the operation of the concordat, in respect to the future accumulations of the debtor, concurred on the ground that such discharge as it effected, was granted in contemplation of all the insolvent's existing property being applied to the payment of his debts, and did not impair the right of any creditor to share in the proceeds of such property. DENIO and MASON, Js., also concurred; LOTT, JAMES and HOYT, Js., dissented.
Order affirmed. *Page 192