In the Matter of the Estate of HARRIET BLACKSTONE, Deceased.

Surrogate's Court, New York County, August 29, 1939.

*Miller, Owen, Otis & Bailly*, for the petitioner.

DELEHANTY, S. The petition in this proceeding asks for the probate of a paper writing asserted to be the last will of deceased. Concededly the propounded instrument is a carbon impression made simultaneously with a so-called ribbon copy of the same instrument. The ribbon copy and the carbon now propounded are shown to have been executed by the deceased. Each was duly witnessed and duly published as the will of deceased. The ribbon copy is missing. The case, therefore, presents another one of those problems created by the unwise practice of having duplicate executions of a will. By decision heretofore filed the court rejected the propounded instrument and held that it could not be probated. Reargument of that determination was sought and granted and the matter is now before the court after such reargument.

Two questions are presented. The first was dealt with briefly in the opinion heretofore filed. That opinion held that declarations of a testator as to *non*-revocation of a will were equally incompetent as are declarations of revocation. The declarations are offered in support of a theory of proponent that thereby the presumption of revocation would be rebutted which arises in this proceeding by reason of the fact that the ribbon copy shown to have been once in the possession of deceased has not been found.

The general rule in New York is that declarations of deceased respecting the revocation or non-revocation of his will are admissible only if they are part of the *res gestæ*. It is argued, however, that this rule should be limited to situations where it is contended that deceased revoked his will and that the contrary rule should apply where the contention is that deceased did *not* revoke the will. The cases which seem to favor a rule making declarations admissible though they are not part of the *res gestæ* are few in number. Such an opinion was expressed by the dissenting judges in *Jackson* v. *Kniffen* (2 Johns. 31). An attempt was made in that case to show by parol that deceased had revoked his will. SPENCER and TOMPKINS, JJ., thought that the declarations should be allowed to come in. THOMPSON and LIVINGSTON, JJ., and KENT, Ch. J., were of a different view. A dictum in favor of the admissibility of declarations is also to be found in the early case of *Betts* v. *Jackson* (6 Wend. 173, 187, 188). A further dictum is found in *Matter of Rowe* (165 N. Y. Supp. 1064, 1065). According to Surrogate FOWLER (who does not cite authorities in support of this proposition) declarations of the deceased respecting revocation are admissible in two instances of which the second only is relevant to the present problem, viz., declarations are admissible, he says, where " the will is not forthcoming and there is a presumption of destruction or revocation by the testator himself. In such a case the declarations of the testator are at common law competent to rebut the presumption of a revocation by destruction." In *Matter of Cosgrove* (31 Misc. 422, 423) Surrogate THOMAS had a case where a will had been delivered by deceased to his executor who was unable to find it after the death of deceased. This circumstance in itself raised an inference of fraudulent destruction as against the deceased. Surrogate THOMAS, after noting this inference, said: " The declarations of the testatrix to the effect that she believed the will to be still in the custody in which she had placed it, and that it was a valid and unrevoked testamentary document, were competent to rebut any inference of revocation arising from its loss. (*Betts* v. *Jackson*, 6 Wend. 173, 187, 188; *Matter of Marsh*, 45 Hun, 107; *Patterson* v. *Hickey*, 32 Ga. 156; *Matter of Johnson*, 40 Conn. 587.)

Declarations to sustain an alleged revocation of a will shown to be in existence and uninjured, stand upon a different ground, and are governed by a different rule. (*Matter of Marsh*, 45 Hun, 107; *Waterman* v. *Whitney*, 11 N. Y. 157; *Eighmy* v. *People*, 79 id. 546, 558.) " Of all the New York cases cited by Surrogate THOMAS, *Matter of Marsh* alone can be deemed an authority for the principle formulated by the surrogate. A discussion of that case appears below. Finally, in *Matter of Pattison* (78 Misc. 699) declarations not part of the *res gestæ* were admitted by Surrogate MILLARD in order to show *non*-revocation. No authorities were cited in support of this decision.

In *Matter of Marsh* (*supra*) a general review of cases is made in an attempt by the court to distinguish the matter before it from the leading case of *Waterman* v. *Whitney* (11 N. Y. 157). In the *Marsh* case the declarations in question were offered to prove *non*-revocation of a missing will whereas in the *Waterman* case they had been offered to prove revocation. The court in *Matter of Marsh* declared that a distinction between the two purposes existed. Then it added (p. 111): " The question whether the distinction is substantial and may be observed in support of the ruling of the court below may be one of some doubt and difficulty." The court then cites English cases to show that declarations are received by the English courts as proof of non-revocation of a missing will. It then says (p. 112): " The evidence of this character involves no act other than that of continued possession by the testator of his will. And it may be somewhat difficult to so apply the principles upon which the general rules of evidence are established as to demonstrate the admissibility of the declarations in question, unless the custody of the will by him from the time of its execution may be treated as included within the *res gestæ*."

Following this reasoning the court " with some hesitation " held that the declarations of non-revocation were admissible to overcome the presumption of revocation.

The *Marsh* case was severely criticized by *Matter of Kennedy* (167 N. Y. 163, 173, 174). There the court said: " In the present case the proof was offered in order to show that a written will had *not been revoked*, and the principal authority in this State cited to support the proposition is a comparatively recent case. (*Matter of Marsh*, 45 Hun, 107.) * * * The decision in that case, therefore, rests entirely upon some assumed distinction between declarations tending to prove *revocation*, which the learned court held to be incompetent, and declarations tending to prove *non-revocation*, which it held in that case to be admissible * * *. The decision in that case rests upon a distinction which does not

exist. When the learned court admitted, as it did, that the declarations of the testator, unaccompanied by any act, were incompetent to prove revocation, there was no basis left in reason or law for the conclusion that they were admissible to disprove the same fact." (Italics in original.)

The *Kennedy* doctrine had previously been formulated in explicit terms by Surrogate ROLLINS in *Hammersley* v. *Lockman* (2 Dem. 524; affd., without, however, expressly affirming on this point, 7 N. Y. St. Repr. 292). Surrogate ROLLINS said (p. 531): " I see no reason why the question of the admissibility of a testator's declarations to show the revocation of his will should not be tried by the same tests as the question of the admissibility of a testator's declarations to show non-revocation."

Authority for the proposition that declarations on revocation which are not part of the *res gestæ* are absolutely inadmissible is ample. (*Matter of Staiger*, 243 N. Y. 468; *Matter of Hopkins*, 73 App. Div. 559, 568, 569; revd. on other grounds, 172 N. Y. 360; *Eighmy* v. *People*, 79 id. 546, 559; *Matter of Casey*, 126 Misc. 749, 750, and see note 79 A. L. R. 1493, 1496, 1500.)

The English courts admit declarations not part of the *res gestæ*. They are accorded little weight however. Thus in *Colvin* v. *Fraser* (162 Eng. Rep. 856) the will had been executed in duplicate. One example was in the custody of deceased. On his death that example was not forthcoming and there was no direct evidence of what happened to it. Ths sole evidence of its existence at the time of deceased's death consisted of declarations of the deceased. The court said that these would not suffice to overcome the presumption of destruction and it accordingly held that deceased died intestate. Respecting declarations the court said (p. 884): " Declarations alone unsupported by circumstances strongly marking their sincerity and confirming their probability, would of themselves be very unsafe and insufficient to repel the presumption of law." And in *Pemberton* v. *Pemberton* (33 Eng. Rep. 303, 307) Lord ELDON expressed himself as follows: " Few declarations deserve less credit than those of men as to what they have done by their Wills. The wish to silence importunity, to elude questions  *  *  *  must be taken into consideration."

The foregoing discussion requires that the court disregard all of the proof presented to the probate clerk in the nature of declarations of the deceased respecting her will and its existence.

This ruling would dispose of the probate proceeding except for a further body of proof which proponent urges is sufficient (wholly apart from the declarations) to rebut the presumption of destruction of the ribbon copy by deceased with intent to revoke

her will. Proponent's theory of this proof is that it shows a care of the carbon copy which is consistent only with the idea that deceased believed it was her original and kept it as such. Though the analysis hereafter made shows that the proof does not reach the level argued for on the facts by the proponent, the court would be prepared to rule as a matter of law that the presumption of revocation stands unrebutted whatever weight be given to the facts.

The instrument now propounded is patently a carbon imprint. At the bottom of page 2 after the attestation clause and the signatures of the witnesses it bears in ink and in parenthesis the word " copy." On this page deceased undoubtedly would have seen her own genuine signature. She perhaps might have also studied the signatures of the witnesses sufficiently to have concluded that they were made by different persons. The appearance of such signatures, however, would not necessarily exclude the possibility that they were made by a lawyer's clerk in conforming the so-called " copy " to the ribbon imprint. The signatures are not so distinctly dissimilar as to force upon the mind of a casual observer the knowledge that they were written in different hands. The carbon instrument was found in a drawer which contained miscellaneous papers of deceased. One such paper (Proponent's Exhibit 1) is consistent with the continued operation of the propounded instrument as the will of deceased. Another (Proponent's Exhibit 2) is dispositive in form and is inconsistent with the continued operation of the propounded instrument. In the same drawer were a stock certificate, deeds to real property, jewelry, tax receipts and foreign currency, although whether the latter was of a repudiated issue or a current issue does not appear. One of the witnesses said that still other papers in the handwriting of deceased were in the drawer. One witness testified to the impression made upon the searchers for the will by the finding of the paper now propounded. She reports the group as convinced that the instrument was only a copy and was not the instrument for which search was then being made. This witness also said that the drawer contained some dinner menus and other things presumed to be of no value which were thrown away.

This recital shows that there is no factual basis for the argument that deceased dealt with the propounded paper so carefully as to require the finding that she believed it to be her original will and preserved it as such. The facts proved would require a finding to the contrary — a finding that the paper was dealt with by the deceased as only a copy which she left in a drawer containing papers both trivial and important. Nothing in the factual situation would sustain a holding that the continued keeping of the carbon rebutted

the presumption which arises from the failure to find the ribbon copy.

But aside from this purely factual basis for decision, the court holds as matter of law that the presumption of revocation has not been rebutted. The basis for this ruling is found in *Crossman v. Crossman* (95 N. Y. 145, 149, 150, 152). Speaking there of the situation created by duplicate executions of a will, the court said (p. 149): "It is undoubtedly true that where two testamentary papers are executed at the same time, with the formalities required by law, they must be taken together to constitute the will of the testator. If the two papers contain different provisions, the one making bequests or devises not contained in the other, then both must be proved and admitted to probate, and both constitute, when read together, the will of the testator, as if all the provisions of both were contained in one instrument. (*Matter of Forman,* 54 Barb. 274.)" The court goes on to say that in the case of a will it is absolutely necessary to produce both examples because it is necessary to ascertain expressly whether or not they are exactly alike. In this connection the court said (p. 152): "As soon as it is brought to the attention of the surrogate that there are duplicates of a will presented to him for probate, it is proper that he should require both duplicates to be presented, not for the purpose of admitting both as separate instruments to probate, but that he may be assured whether the will has been revoked, and whether each completely contains the will of the testator."

Continuing with the discussion of the legal effects resulting from duplicate executions, the court said (p. 150): "Where the duplicates are exactly alike, each expresses and contains the will of the testator, and either may be proved and admitted to probate without the other. * * * *The proponents of either duplicate can undoubtedly be required to produce the other, so that both may be before the court for inspection, that it may be seen whether they are precisely alike, or whether there has been any revocation. But when it appears that they are alike, and that there has been no revocation, then it would be quite an idle ceremony to prove both, or to admit both to probate.* Numerous cases were cited by the learned counsel for the contestants, holding that where a will is executed in duplicates *a revocation of one according to law animo revocandi is a revocation of both. As each contains the will of the testator, a revocation of either is a revocation of his will, and thus revokes both.*" (Italics supplied.)

A very recent authority (*Matter of Robinson,* 257 App. Div. 405, 407) restates the rule as follows:

" The authorities are uniform in holding that when it appears, as here, that a will was executed in duplicate, one paper cannot be probated without producing the other or accounting for its non-production, the theory being that testator can destroy his will by destroying the one in his possession without repossessing and destroying its duplicate. (*Crossman* v. *Crossman*, 95 N. Y. 145; *Matter of Jacobstein*, 253 App. Div. 458.)

" The reason for this rule is well stated in *Crossman* v. *Crossman* (*supra*). When two wills are executed simultaneously they constitute one document. They may not be identical in terms. If they differ, both should be offered for probate so that the whole will may be probated. If they are identical then only one need be probated because the other is incorporated in it, and it would be a useless ceremony to probate the same will twice. But the court cannot determine whether the two wills are identical unless both are produced."

That this deceased received only the ribbon copy in the first instance is clearly proved. That long after such receipt of the ribbon copy she personally asked her attorney for the second imprint was also proved. The paper propounded is dated February, 1937. The request for the copy was made in July, 1938. The attorney who testified to the request for the copy was not asked for the text of the request addressed to him by deceased. He reports the transaction thus: " She telephoned me asking me to give her this copy which I proceeded to do." Whether the word copy as so used was a repetition of a word used by deceased or was merely a descriptive term used by the witness is not clear. In any event, the rule is plainly applicable that when one of two examples of a duplicate will is shown to have been under the control of the testator and such example is not produced or accounted for, there is a presumption that the will was destroyed by the testator with intent to revoke it. (*Matter of Jacobstein*, 253 App. Div. 458, 461; *Crossman* v. *Crossman*, 95 N. Y. 145; *Boughey* v. *Moreton*, [1758] 161 Eng. Rep. 429; *Matter of Schofield*, 72 Misc. 281; *Matter of Field*, 109 id. 409; *Matter of Andriola*, 160 id. 775; *Matter of Breding*, 161 id. 322; affd., 251 App. Div. 737.) As was said in *Crossman* v. *Crossman* (*supra*), the revocation of either copy " is a revocation of his will and thus revokes both."

The text quoted from *Crossman* v. *Crossman* (*supra*) requires the holding that when both copies of a will executed in duplicate are shown to have been in the possession of a testator and only one is found after death the presumption of revocation is the same as that arising when only one copy was in his possession and is not found after death. The only authority to the contrary cited by

counsel for proponent is *Matter of Shields* (117 Misc. 96). That case is clearly contrary to the controlling authorities and will not be followed.

Accordingly on reargument the original determination is adhered to and the instrument propounded is denied probate. Submit decree accordingly.