================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 64
In the Matter of the Estate of
Robyn R. Lewis, Deceased.

James Robert Simmons,
          Respondent;
Meredith M. Stewart, et al.,
          Appellants.


          John A. Cirando, for appellants.
          Julian B. Modesti, for respondent.


LIPPMAN, Chief Judge:

          At the time of her death in March 2010, it appeared

after a thorough search that decedent Robyn R. Lewis had left no

will.  Letters of estate administration were therefore issued to

her parents, Meredith M. Stewart and Ronald L. Lewis, pursuant to

SCPA § 1001 (1) (d); although decedent had been married to James

- 1 -

A. Simmons, the marriage ended without issue in 2007 when the couple divorced, leaving decedent's parents as her sole distributees (see EPTL § 4-1.1 [4]).  They, however, renounced their interest in decedent's Clayton, New York residence in favor of decedent's brothers Ronald L. Lewis, II and Jonathan Lewis.  The Clayton property, which had been in decedent's family for generations, would thus have passed to decedent's blood relations but for the December 2010 filing in Jefferson County Surrogate's Court of petitions to revoke the parents' letters of administration and to admit to probate a will executed by decedent in Texas in 1996.  That will bequeathed all of decedent's property, real and personal, to her then husband James A. Simmons, and named him as the will's executor.  The will had been in the possession of the ex-husband's mother who retrieved it from her dresser after her son informed her that he had learned during a recent internet search of his former wife's death some eight months before.  The son brought the will to an attorney, and this proceeding was shortly commenced.

The present petitions, however, were brought not by the son but, nominally, by his father, James Robert Simmons.[1]  Although the son was disqualified by reason of his divorce from decedent from serving as her executor or taking under the proffered pre-divorce will (see EPTL 5-1.4 [a] [1], [3]),

_____

[1]Mr. Simmons senior made no bones about the fact that he was not the real party in interest.  He testified that he was "not the petitioner" and was "just along for the ride."

decedent's former father-in-law, who was named in the will as decedent's alternate executor and beneficiary, was not so disqualified under New York law,[2] which governs the disposition of decedent's New York real property, the sole asset of significant value in her estate. Objections to probate were filed by decedent's parents and brothers.

During the ensuing probate proceedings, decedent's ex-husband testified that the will offered for probate was one of a pair of reciprocal or "mirror" wills made by the then married couple. Those wills and several other instruments bearing on end-of-life decisions were, according to the former husband, executed during a single session at an attorney's office in Texas in 1996. Each instrument, he said, was generated in quadruplicate, and although he described each set of four as composed of one original and three "copies," the natural, albeit less than certain, import of his testimony was that each copy was intended to be a functional instrument. He testified,

---

[2]He was, however, under Texas law, which provides in relevant part that "[i]f, after the testator makes a will, the testator's marriage is dissolved by divorce, annulment, or a declaration that the marriage is void, all provisions in the will, including all fiduciary appointments, shall be read as if the former spouse and each relative of the former spouse who is not a relative of the testator failed to survive the testator, unless the will expressly provides otherwise" (VTCA Estates Code § 123.001 [b] [emphasis added]). After decedent's divorce, her ex-husband's father, petitioner, ceased to be her "relative" within the relevant definition of Texas law (see VTCA Estates Code § 123.001 [a]).

"they were all done [the same day] at [the attorney's] office, both the originals of course and the copies. And we planned from that day, Robyn and I, to have one set at my parents' house, one set at our Texas house, one set at the New York house and one set in a safe deposit box. That was all planned out before we sat down that day and -- and signed all those signatures."

Later in his testimony he explained,

"we had four sets of everything at each house for a reason. We both traveled. We knew one house could burn down, this, that and the other."

During the probate proceeding, testimony was also elicited from Marilew Barnes. Ms. Barnes had been decedent's friend, neighbor and confidante. She had been given powers of attorney by decedent -- both legal and medical -- and had assisted decedent with financial and health-related matters during the period following her divorce when her ability to manage her own affairs was compromised by the debilitating and ultimately fatal sequellae of alcohol addiction. Ms. Barnes stated that it had been a priority of decedent's to make a new will once her divorce became final, and that in the fall of 2007 decedent brought to her for her examination, and then discussed with her, what she understood to be a will that contained a provision revoking all prior wills and codicils. Nonetheless, as noted, no will was found during a diligent post-mortem search of decedent's home and possessions.

The Surrogate, while not skeptical of Ms. Barnes's account as to what she saw and read, and while acknowledging "how

the fact that the will [offered for probate] was drafted 10 years prior to the decedent's divorce raises suspicions in [objectants'] eyes as to whether the will truly reflects what the decedent would have wanted when she passed in 2010," nevertheless understood himself to be bound to dismiss the objections to the 1996 will and to admit it to probate.  This was because Ms. Barnes had not witnessed the signing of the evidently lost 2007 will and her testimony, therefore, could not prove that the will had been duly executed.  Without proof of due execution, the lost will could not, in the Surrogate's view, be given effect, even for the limited purpose of revoking the 1996 will.  As to the ex-husband's testimony indicating that the 1996 will had, by design, been executed in four equally functional counterparts to be kept separately at specified locations, among them decedent's post-divorce Clayton, New York residence,[3] the Surrogate noted only that "[i]t is not clear from the testimony of the witnesses if the decedent and Mr. Simmons left the attorney's office with four original instruments or one original and three copies."

A divided Appellate Division affirmed the Surrogate's decision and decree (114 AD3d 203 [2014]).  This Court granted objectants' motion for leave to appeal (23 NY3d 906 [2014]), and we now modify.

Preliminarily, we note that the lower courts properly

---

[3]Decedent had been awarded the Clayton residence in the couple's divorce settlement.

refused to give revocatory effect to the lost will described by Ms. Barnes.  Estates Powers and Trusts Law § 3-4.1 (a) (1) (B), particularly as we have construed it in Matter of Coffed (46 NY2d 514, 519 [1979]), commands categorically that revocation of a will by a subsequent will or other writing may be accomplished only by executing the revoking instrument "with the formalities prescribed . . . for the execution and attestation of a will." As we observed in Coffed, this requirement's stringency has been deemed necessary to prevent fraud and flippancy in the making and revocation of testamentary instruments generally; its prophylactic utility would be largely undone if it were dispensable in the individual, seemingly sympathetic case (see id. at 519).

Although objectants' claim of revocation by a subsequent writing was properly rejected, it does not follow that the 1996 will was proved.  Indeed, the evidence before the Surrogate raised a most serious, and unresolved, question as to whether the 1996 will had been otherwise revoked, and while that question persisted the will should not have been admitted to probate.

A will may, of course, be revoked not only by means of a writing executed in the manner of a will, but by the testator's act of destroying it with revocatory intent (EPTL 3-4.1 [a] [2] [A] [i]), which act achieves the revocatory purpose even if there remain will duplicates outstanding (Crossman v Crossman, 95 NY

145, 152 [1884]). That a testator has in fact revoked a will by destruction is strongly presumed where the will, although once possessed by the testator, cannot be found posthumously despite a thorough search (Matter of Fox, 9 NY2d 400, 407-408 [1961]; Matter of Staiger, 243 NY 468, 472 [1926]; Matter of Kennedy, 167 NY 163, 168-169 [1901]). The presumption, once raised, "stands in the place of positive proof" (Staiger, 243 NY at 472) and must be rebutted by the will's proponent as a condition of probate (Matter of Fox, 9 NY2d at 407).

Here, the facts of record, adduced in critical part through the testimony of petitioner's son, supported inferences that decedent executed her 1996 will in quadruplicate, with each document having been meant to possess the force of an original instrument; that one of the will duplicates was kept at the Clayton, New York home where decedent resided after her divorce; and that, after a thorough search, no will was found there. Plainly, these circumstances sufficed to raise the presumption that decedent revoked her 1996 will by destroying it. It is equally plain that that presumption was not rebutted. None of the other duplicate wills was produced or otherwise accounted for. And, although petitioner now urges that the unproduced duplicates were merely copies, the uncertain status of the will duplicates, although commented upon by the Surrogate, was never resolved. We are left then with a will admitted to probate upon a record sufficient only to disprove it.

It is precisely to avoid such an incongruous outcome that the governing rule of proceeding has long been that

> "[a]s soon as it is brought to the attention of the surrogate that there are duplicates of a will presented to him for probate, it is proper that he should require [the] duplicates to be presented, not for the purpose of admitting both as separate instruments to probate, but that he may be assured whether the will has been revoked, and whether each completely contains the will of the testator"

(Crossman, 95 NY at 152; and see e.g. Matter of Robinson, 257 App Div 405, 407 [4th Dept 1939]; Matter of Blackstone, 172 Misc 479, 484 [Surrogates Court, NY Co. 1939]).  Here, it is manifest that the Surrogate's attention was drawn to the existence of will duplicates, but the consequently arising issues as to the will's validity were not resolved as they should have been in accordance with Crossman's instruction.  Petitioner was required not merely to exclude the possibility, but to rebut the legal presumption of revocation, sufficiently raised by the ex-husband's testimony as to the existence of will duplicates, one of which had been kept, but was not found after decedent's passing, at her post-divorce residence.  The necessity of such a showing was in this matter highlighted by the circumstance that the 1996 will, reciprocally bequeathing all of decedent's property to her then husband, reflected a testamentary design irretrievably bound up with the testator's since terminated spousal status.

While the record in its present state would only support a denial of probate, we recognize that the crucial issues

raised by the duplicate will testimony were not framed for resolution as they should have been and that this may have operated to deprive petitioner of a fair opportunity to avoid or rebut the presumption of revocation which otherwise must control the outcome of this proceeding.  We therefore remand the matter to the Surrogate so that these pivotal issues can be fully litigated and determined.

Accordingly, the orders of the Appellate Division should be modified, without costs, by remitting to Surrogate's Court for further proceedings in accordance with this opinion, and, as so modified, affirmed.

Matter of the Estate of Robyn R. Lewis

No. 64

PIGOTT, J.(concurring):

While I agree with my colleagues that remittal to Surrogate Court is the appropriate result, I write separately to express my disagreement with the majority's dicta, in the hope that this added language will not be misinterpreted as a holding by this Court and lead the Surrogate to believe the issue has already been decided.

The issue for the Surrogate to resolve on remittal is whether there were four original instruments or one original and three copies of the decedent's will (see Roche v Nason, 185 NY 128 [1906]; In re Andriola's Will, 160 Misc 775 [Sur Ct 1936]). If the Surrogate determines that there were four original instruments, it must then decide whether the presumption of revocation was triggered and whether that presumption was rebutted (see Crossman v Crossman, 95 NY 145 [1884] [presumption]; In re Fox' Will, 9 NY2d 400 [1961] [rebuttal]).

The majority discusses the ex-husband's testimony and surmises that "the natural, albeit less than certain, import of [the ex-husband's] testimony was that each copy was intended to be a functional instrument" (maj opn at 3). The majority further states that "ex-husband's testimony indicat[es] that the 1996

- 1 -

will had, by design, been executed in <u>four equally functional counterparts</u> to be kept separately at specified locations" (maj opn at 8 [emphasis added]).  In doing so, the majority, in essence, discredits the ex-husband's testimony that he and the decedent executed "two wills, two power of attorneys and two directive to physicians", and that there was only one original of "each six documents."  The quality and weight afforded to ex-husband's testimony, as well as any other testimony, is clearly in the province of Surrogate Court.  In other words, whether there were "four equally functional counterparts" of the decedent's will is a question of fact that is left to be resolved by the Surrogate.

The majority then suggests, again in dicta, that

"the facts of record, adduced in critical part through the testimony of petitioner's son, supported inferences that decedent executed her 1996 will in quadruplicate, <u>with each document having been meant to possess the force of an original instrument</u>; that one of the will duplicates was kept at the Clayton, New York home where decedent resided after her divorce; and that, after a thorough search, no will was found there ... [and that] ... [p]lainly, these circumstances</u> <u>sufficed to raise the presumption that decedent revoked her 1996 will by destroying it.  It is equally plain that that presumption was not rebutted</u>" (maj opn at 7 [emphasis added]).

While the majority may claim that it is simply reading the record before it, this dicta may be viewed by some as a disguised holding.  "However grievous the errors a court commits when it writes dictum disguised as holding, those errors would be

neutralized if the next court would *recognize the prior dictum as nonbinding and go on to grapple with and decide the issue*" (see Leval, Madison Lecture: Judging Under the Constitution: Dicta about Dicta, 81 N.Y.U. L. Rev. 1249, 1268-1269 [2006] [emphasis added]).  I encourage the Surrogate Court to "grapple with and decide the" issues without consideration of the majority's dicta.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Orders modified, without costs, by remitting to Surrogate's Court, Jefferson County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.  Opinion by Chief Judge Lippman.  Judges Read, Rivera, Abdus-Salaam and Stein concur.  Judge Pigott concurs in result in a separate concurring opinion.  Judge Fahey took no part.

Decided June 4, 2015