Matter of Stone (2025 NY Slip Op 52076(U))

[*1]

Matter of Stone

2025 NY Slip Op 52076(U)

Decided on April 15, 2025

Surrogate's Court, Saratoga County

Schopf, S.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 15, 2025
Surrogate's Court, Saratoga County

Probate Proceeding, Will of Gary E. Stone, Deceased.

File No. 2024-464

Jeffrey B. Shapiro, Esq.BARTLETT, PONTIFF, STEWART & RHODES, P.C.One Washington StreetPO BOX 2168Glens Falls, New York 12801Attorneys for Objectant Tara StoneGraham A. Thompson, Esq.TABNER, RYAN & KENIRY, LLP18 Corporate Woods Blvd., Suite 8Albany, New York 12211Attorneys for Petitioner

Jonathan G. Schopf, S.

This matter comes before the Court on a motion by Objectant for an Order vacating this Court's Decree dated January 22, 2205 which granted Letters Testamentary to the Petitioner and granting leave to file Objections nunc pro tunc.
The procedural history and facts giving rise to the motion are well set forth in the moving and opposition papers and are not in controversy. As a threshold issue, upon review of all the submissions and arguments, I determine that my intent when issuing the scheduling order was that objections would be due within thirty (30) days of the receipt by the Court Clerk of the transcripts from the hearing (an event which occurred on December 18, 2025 which lead to this Court issuing its Decree on January 22, 2025), which is the argument advanced by Petitioner.
However, in reviewing the Order and divorcing my own mind from my intent, I can see how the opposite inference could be drawn, and Objectant's counsel could have reasonably perceived the Order to require that objections be filed within thirty (30) days of his receipt of the transcript (an event which occurred on December 23, 2024 [FN1]
).
I will not be punitive in imposing a deadline upon counsel for what appears to be a good-faith interpretation of the Order at issue. Therefore, I find that in applying the facts with General Construction Law §19, the proper due date for the filing of objections was January 22, 2025. Moreover, critically, I find that Objectant's counsel would have properly had until midnight on that date to do so and to pay the requisite fee, see 22 NYCRR §207.4-a[e][3]. Counsel for Petitioner argues that the thirty-day period ran at 11:06am. This proposition has long been unsupported at law, see General Construction Law §19, and, Garelick v. Rosen, 274 NY 64 [1937] and its progeny. Moreover, it has long been the law that "calendar day" includes the time from midnight to midnight and that 24 hours constitutes a "full day", see Uptown Transp. Corp. v. Fisk Discount Corp., 150 Misc. 829 [1934, Sup. Ct. NY County]. It has even longer been held that the only instance in which the law regards fractions of a day, are where the hour of the day is material, such as in cases to determine priority of liens, see, Phelan v. Douglass, 11 How. Prac. 193 [1855], Haden v. Buddensick, 49 How. Prac. 241 [1875], and Marvin v. Marvin, 75 NY 240 [1878]. This holds true today, consider and contrast, People v. Miller, 75 Misc 3d 215 [2022 Kings County] a case in County Criminal Court which held that service of a Statement of Readiness and other papers was untimely when served after business hours on the date due when further action by the court clerk needed to be done to process the papers. In Surrogate's Court, 22 NYCRR §207.4-a[e][3] controls and deems the papers timely filed if received by midnight on the date due.
After reviewing the parties' submissions, researching the law, and having an opportunity to hear oral argument from counsel, the essential issue before the Court as I see it is: "did Objectant's counsel have a full and fair opportunity to timely electronically file his client's objections on the date at issue, which is January 22, 2025?"
The Saratoga County Surrogate's Court Clerk's Office is a known model of efficiency. Acting under the presumption that the objections were due to be filed by midnight on January 17, 2025 (a Friday), it is undisputed that the Clerk's Office processed the ministerial paperwork, and presented the Decree admitting the Will to probate to the undersigned for review and execution on January 22, 2025. This was done at my direction on Tuesday, January 21, 2025 (Monday January 20th was a court holiday) as objections were not filed on the perceived deadline of January 17th.
The same Decree was executed and uploaded to the UCMS/ NYSCEF system on Wednesday January 22, 2025 at 4:34 in the afternoon, followed immediately thereafter by Letters at 4:35pm. Following this, counsel for Objectant uploaded a letter at 5:52 in the afternoon confirming his belief that the objections were due that same date, requesting that the Decree be withdrawn and that Objectant be permitted to interpose her objections [FN2]
. Curiously, the Objections were not filed in the intervening time between 5:52pm and midnight, which forms the main basis for the Petitioner's objection to the Court's acceptance of the proposed Objections.
Petitioner's counsel makes a sound argument concerning the legal standard for the [*2]consideration of late objections. The legal standard is the equivalent for seeking leave to file a late answer under the CPLR which places the burden on the proponent of the objections and requires that the Court consider: (1) the reason for the delay; (2) the extent of the delay; (3) the deliberateness of the default; (4) any prejudice that may result from the default; and (5) the merits of the proposed objections.
In his moving papers, counsel for the Objectant attaches proposed Objections, which purport to be verified and sworn to before a notary public on January 22, 2025 [FN3]
. Upon inquiry at oral argument, Counsel (an associate at his law firm) stated that his firm was "working on the objections" on the 22nd of January and that he did not upload the Objections after the Court issued the Decree upon consultation with senior partners at the firm on that date. He advised that an internal decision was made and that the prevailing belief was that seeking an order nunc pro tunc vacating the decree was the appropriate legal process to follow.
Although reasonable minds of reasonable attorneys can differ, in the Court's opinion, the better course of action to have absolutely preserved the Objections would have been to file the Objections in due course prior to midnight on the date of the deadline. While the I cannot agree that the choice to not upload the Objections on the due date was the right course of action, Mr. Shapiro undertook reasonable action in consulting with senior attorneys at the firm and was compelled to follow their guidance. The guidance given by a senior partner at the firm should not be held against an associate who is compelled to follow the guidance of his employer in such matters.
I find that counsel preserved the right to argue the point by timely filing a letter objecting to the Court's issuance of its Decree and has somewhat circuitously demonstrated that the default was not deliberate, and if anything, may have been a result of misperception of the scheduling order or law office failure [FN4]
in either not seeking clarification from the Court on the due date set forth in the scheduling order or in the ultimate decision to not file objections on the due date, but instead a letter of explanation. In lawyering as with football, it is easy to review the plays made under pressure on the field on Sunday from the comfort of one's recliner Monday morning.
With the time-period of only a few hours [FN5]
involved, there is no prejudice to the Petitioner. As a matter of fundamental fairness, as set forth in the decretal language of this Order [*3]below, the Court will treat a portion of the Objections annexed to the moving papers of the Objectant deemed timely as if they had been submitted on January 22, 2025.
The Court must also consider the fifth prong of the analysis, that being the merits of the Objections proposed. The Objections raise several issues. First, they allege that the Decedent was not competent to make a Will on February 8, 2023 in that he did not know the natural objects of his bounty, was not of sound mind and memory, was not mentally capable and lacked clearness of mind. Secondly, that the Will lacked due execution, and third that the Will was procured by undue influence and fraud on part of Petitioner, Decedent's son-in-law, Todd Cafarelli.
In reviewing the proposed Objections vis-à-vis the testimony adduced at the §1404 hearing, I determine that issues of fact exist which the Objectant should be entitled to discovery upon and may potentially require a hearing on the Objections asserted at subparagraphs "C" and "E" of the same. That being said, based upon the same review, I cannot find merit in the objection asserted at subparagraph "D" that the Will lacks for due execution.
The Court had the opportunity to observe the witness testimony at the §1404 hearing. The testimony of the witnesses could not have been more credible and logical. The witnesses to the Will were friends of the decedent related by marriage of their children (they are the parents of purported draftsman, Todd Cafarelli [FN6]
, the decedent's son-in-law) and testified truthfully and accurately as to their recollections of the events surrounding the Will execution.
As the execution was supervised by an attorney, the presumption that the execution ceremony was properly undertaken attaches. See Matter of Hedges, 100 AD2d 586 [2nd Dep't. 1984]. As such, the Will enjoys a rebuttable presumption of due execution. Critically to this matter, if an attorney supervises the execution of the will, the court may rely on the presumption of regularity when the witnesses cannot accurately recall whether the testator asked them to witness his will. See Matter of Smith, N.Y.L.J., October 8, 2013, at 24, col. 4 [Surrogate's Court, Suffolk County].
In order for a will to be admitted to probate, "it must be established that all the writing formed a single instrument which the [testator] subscribed and ... published as [his or her] will in the presence of the attesting witnesses" see, Matter of Allen, 282 NY 492, 496 [1940] and it must comply with the provisions of EPTL §3-2.1. Applying the foregoing standard against a review of the §1404 transcript in conjunction with the caselaw below shows that EPTL §3-2.1 was complied with.
Petitioner's first witness at the hearing was Robert Cafarelli. He testified that the decedent was suffering from ALS and that his wishes were that the Will execution and circumstances surrounding his illness be kept private. He testified specifically that:
A: "[w]e were asked to be witnesses, I think by my son, but I had a conversation with Gary at some point . . . " (Tr. Pg. 9 L. 2-3);
 - - -A: "it was sort of formal, I mean, in a sense that Todd read the will."
Q: "Did he read the entirety of [the Will] out loud?"
A: "As I recall he did, yes."
Q: "And when he did that, who was present?"
A: "Me, Barbara, Gary, Bonnie . . . "
Q: "Okay. So after he reads it out loud, is there some conversation?"
A: "No, I don't recall any conversation. Gary signed it and then I signed it. Yeah, I signed it, then Barbara signed it."
Q: "And did you see the decedent, Gary, sign it?"
A: "Yes."
Q: "And who was present when he signed it?
A: "Barbara, me, Todd, Gary, Bonnie." (Tr. Pg. 12 L. 25 — Pg. 13 L.1-16).

- - -

Q: "Did you sign it at the request of the decedent?"
A: "Yes."
Q: "And did he make some statements in that regard?"
A: "I think he was grateful, but I don't know that he, I don't recall having a conversation about it except that he knew I was going to do it and he was comfortable with that, and —-" (Tr. Pg. 13 L. 20 -Pg. 14 L. 1).

- - -

Q: "Did you sign the [Will] at his request?"
A: "Yes." (Tr. Pg. 14 L. 6-7)
Q: "Did you sign the Court's Exhibit one at his request?"
A: "Yes."
Q: "And is that your signature on Court's Exhibit one?"
A: "Yes."
Q: "And when you signed it, who was present?"
A: "Barbara, Todd, Gary, Bonnie, and I don't know if Courtney may or may not have been there. I don't think she was."
Q: "Okay. And did you observe Barbara sign it?"
A: "Yes."
Q: "And who was present when Barbara signed it?"
A: "The same."
Q: "And when she signed it, I take it she signed it after you?"
A: "Yeah, I think, yeah. Yeah, I'm sure that's the way it happened." (Tr. Pg. 14 L. 6-21)
Q: "The decedent's signing of the [Will], when he signed, when he, Gary, signed this will, do you recall what, if anything, your son, Todd, may have said at that time?"
A: "No. He read the will. I think that he asked — I don't recall. I think he said, Gary is this what you intend or whatever the word, whatever words he used, and Gary's — yeah, then Gary said yes and signed it . . . ." (Tr. P. 18 L. 17-24).

- - -

Q: "Okay. And you never discussed being a witness with Gary?"
A: "We, I had a - - I don't know whether it was that day, earlier. It had to be earlier. Yeah, it was earlier. We talked about the fact, again, that he thought stuff would go to Bonnie. He now understood it wouldn't. He asked Todd to do a simple will. He wanted to keep it very private, and that therefore, Barbara and I were going to witness it 'cause that kept it within the family." (Tr. Pg. 27 L. 12-20).

- - -

Q: "Okay. And during the will execution, did Gary say at any point to you the exact words that he wanted you to witness his will?"
A: "Not that I recall." (Tr. Pg. 29 L. 20-23).

- - -

Q: "Did Gary ever say to you this is my will?"
A: "Not that I recall." (Tr. Pg. 30 L.7-8).

- - -

Q:" . . . Did Todd ever ask Gary, is this your will?"
A: "I think he did, yes. I think that was, yeah, I think that was, yes. I don't remember everything that, you know, the whole sequence. It was just, but yeah, I think he did. (Tr. Pg. 31 L. 2-6).

- - -

Q: " Did Todd ever explain why?"
A: I think he did but I'm not sure. I think as I, yeah, I think he did. He would read the will and ask Gary if it was his wishes and Gary would sign. That's like, a different conversation maybe." (Tr. Pg. 39 L. 2-5). [Emphasis added as to underlined material].
Critically, Barbara Cafarelli testified specifically that:
Q: "So Gary signed the will in your presence?"
A: "He did, yes." (Tr. Pg. 49 L. 2-3)

- - -

Q: "You know where I'm going. Did Gary [declare][FN7]
 the document to be his last will and testament?"
A: "Yes, yes." [Emphasis added as to underlined material].
Despite the somewhat contradictory testimony, taking the witness testimony as a whole [FN8]
and assessing it alongside the witness credibility, the circumstances surrounding the Will execution appear to be straightforward and genuine with the witnesses essentially corroborating each other's version of events. In addition to the technical legal requirements of due execution, the witnesses both were of the opinion that he was of sound mind to make such an instrument and to dispose of his property to his wife [FN9]
.
The decedent asked his attorney son-in-law to draft a Will leaving all of his property to his wife, a not uncommon scheme of testamentary disposition. The Will was drafted, and it was generally discussed with the witnesses that they were asked to serve as witnesses to the Will, to which they agreed and the testator was grateful for. The group gathered in the kitchen, the Will [*4]was read aloud in full in a "ceremony" described as "formal" by witness Robert Cafarelli. It appears that the publication and due execution requirements of the statute were met in that following the "ceremony", the Will was executed and witnessed at the request of the decedent. The witnesses were comfortable in the circumstances surrounding the execution of the document and the fact that it was the decedent's desire to do so. 
Moreover, regardless of the inconsistencies of the exact questions asked at the ceremony, the Will contained an attestation clause which meets the statutory requirements. It has long been held that an attestation clause creates a presumption that the testator duly executed the will, but only if the attesting witnesses read the clause. See Woolley v. Woolley, 95 NY 231 [1884]. Here, it is uncontroverted from the testimony that the witnesses were read aloud the attestation clause as a portion of the whole Will, as such their own reading of the clause is rendered moot.
'A valid attestation clause raises a presumption of a will's validity, [but] it is nonetheless incumbent upon [the] Surrogate's Court to examine all of the circumstances surrounding the execution of the document in order to ascertain its validity' " (Matter of Lewis, 114 AD3d 203 [4th Dep't. 2014], 212, mod. 25 NY3d 456, quoting Matter of Halpern, 76 AD3d 429, 431 [1st Dep't. 2010], affd. 16 NY3d 777; and see Matter of Templeton, 116 AD3d 781, 781—782 [2nd Dep't. 2014]; and Matter of Mele, 113 AD3d 858, 860 [2nd Dep't. 2014]). In conducting this examination, " 'the testimony of the attesting witnesses is entitled to great weight' " (Matter of Yen, 127 AD3d 1466, 1467 [3rd Dep't. 2015], quoting Matter of Collins, 60 NY2d 466, 473 [1983]; and see Matter of Falk, 47 AD3d 21 [1st Dep't. 2007]).
It has long been the law that "[i]f the attestation clause is full and the signatures genuine and the circumstances corroborative of due execution, and no evidence disproving a compliance in any particular, the presumption may be lawfully indulged that all the provisions of the statute were complied with, although the witnesses are unable to recollect the execution or what took place at the time." (Matter of Kellum, 52 NY 517, 519 [1873]; see also, In re: Katz' Will, 277 NY 470 [1938]; Matter of Sizer, 129 A.D. 7 [2nd Dep't, 1908], affd. 195 NY 528; In re: Cottrell's Will, 95 NY 329, 333 [1884] ["execution of a will might be established by competent evidence, even against the positive testimony of the subscribing witnesses thereto"]; Matter of Pepoon, 91 NY 255, 259 [1883]; Rugg v. Rugg, 83 NY 592 [1881]; Brown v. Clark, 77 NY 369, 372 [1879]; Trustees of Theol. Seminary v. Calhoun, 25 NY 422 [1862]; Orser v. Orser, 24 NY 51, 52 [1861] holding that a will may be admitted to probate "although none of the subscribing witnesses are able to swear, from recollection, that the formalities required by the statute were complied with".
These propositions carry forth into modern times. The Court of Appeals held in Matter of Collins, Id. at 470 [1983], that the court can probate a will even if both witnesses have a faulty (or no) recollection of the execution ceremony or even if they testify against it. Indeed, in Matter of Natale, 158 AD3d 579, [1st Dep't. 2018], the witness did not remember the ceremony and "thought it improbable" that she had signed the will at the address given. Somewhat similar to the situation at bar, the will execution was supervised by the decedent's attorney-wife, but it unsuspiciously gave everything to her, had a "full attestation clause regularly authenticated," and included a self-proving affidavit [FN10]
. In that case, the court denied the objectant's motion for [*5]summary judgment and the Appellate Division affirmed. This is not a case wherein there is uncontroverted evidence that the testator was unable to execute documents, and the facts lead to the conclusion that the signature was forged, as was the case in Matter of Greene, 89 AD3d 941, 932 N.Y.S.2d 544 [2d Dep't. 2011].
In summary, here, the decedent, a private man, determined that he wished to leave his estate to his wife, made private arrangements with members of his family to have a Will prepared and duly executed. Notably, in drafting a will which left all of the decedent's property to decedent's wife, the attorney-draftsperson excluded his wife (who is decedent's daughter) from the Will and thus eliminated any benefit he would indirectly derive due to his own marriage [FN11]
.
Based on the foregoing, the circumstances of the execution, and the fact that the attestation clause is proper controls and resolves all objections to due execution in favor of the Petitioner. Objectant has leave to file her remaining proposed Objections, which such Objections shall be filed by midnight on April 30, 2025. If after discovery, it appears that dispositive motions as to the remaining Objections would be appropriate, Petitioner may bring the same regardless of the scheduling order contained herein.
THEREFORE; it is hereby
ORDERED, that the motion of the Objectant is granted in part and the Objectant is permitted to file her remaining proposed Objections which were not disposed of by this Decision and Order, which such Objections shall be filed by midnight on April 30, 2025; and it is further
ORDERED, that this Court's January 22, 2025 Decree admitting the Will to probate is vacated; and it is further
ORDERED, that the Letters Testamentary issued to Bonita Stone on January 22, 2025 are hereby vacated; and it is further
ORDERED, that on the Court's own motion, Preliminary Letters Testamentary are to be issued forthwith to Petitioner, Bonita Stone, with limitations therein prohibiting the distribution of any assets of the estate until such other, further and different Order of this Court issues; and it is further
ORDERED, that the Court issues the following scheduling Order:
-Objections to be filed by midnight on April 25, 2025;
-Discovery Demands (including for depositions) be served by May 15, 2025;
 -Paper Discovery Responses to be served by June 15, 2025;
 -Depositions to be concluded by July 15, 2025;-Post Deposition Discovery (if any) to be concluded by August 30, 2025;
-Pre-hearing conference to be held September 10, 2025 @ 1:00 wherein a motion schedule will be set (if necessary) and a hearing to be held on Objections scheduled. Parties should attend the conference with counsel prepared to discuss settlement; and it is furtherORDERED, that the Objectant's remaining arguments and requested relief raised and not otherwise specifically addressed by this Decision and Order are deemed dismissed as being either not relevant or presently without merit in light of this Decision but may properly be raised at a hearing on the Objections permitted herein.
DATED: April 15, 2025HON. JONATHAN G. SCHOPFSARATOGA COUNTY SURROGATEENTEREDPapers Considered:Notice of Motion by Objectant filed February 3, 2025 and amended as to return date by the Court on February 4, 2025Affirmation in Support with Exhibits Annexed filed February 3, 2025Exhibit A - Proposed Objections with Exhibits A, B, C, and D annexed
Exhibit B - Scheduling Order
Exhibit C - Email
Exhibit D - Court Letter
Exhibit E - Attorney Letter to Court
Affirmation In Opposition to Motion filed March 12, 2025 with ExhibitsExhibit A — Emails between counsel
Exhibit B — Emails between counsel
Exhibit C — Emails between counsel
Exhibit D — NYSCEF filing record
Exhibit E — Linked in screenshot
Exhibit F — Linked in screenshot
Exhibit G — Obituary of Marianne McCarthy
Exhibit H — Adirondack Trust screenshot
Memorandum of Law in Opposition filed March 12, 2025Affirmation of Tara Stone in Reply filed March 18, 2025 with ExhibitsExhibit F - Medical Records
Exhibit G - Text Messages
Affirmation of Counsel in Reply filed March 18, 2025 with ExhibitsExhibit H - Email
Memorandum of Law in Reply filed March 18, 2026Objectant's Amended Exhibit F filed March 28, 2025Objectant's Second Amended Exhibit F filed March 31, 2025

Footnotes

Footnote 1:As I noted at oral argument, I was unaware that the UCMS/ NYSCEF system did not generate an automatic email notification to counsel when the transcript was received by the Court Clerk due to the document being taken in as restricted in the Court's system.

Footnote 2:Upon receipt of Petitioner's counsel's letter objecting to this relief, the Court responded to this letter indicating that in could not take action on a mere letter request of this magnitude, especially being that the request was opposed.

Footnote 3:Petitioner notes, as does the Court, that the Objections were electronically signed by counsel on January 21, 2025 and that the notarized verification page does not match the remainder of the document. Counsel has stated as an Officer of the Court that he was in receipt of the verification on the 22nd from his client. The Court will take Counsel at his word and presumes that his firm's file is in compliance with 22 NYCRR §207.4-a[f][2].

Footnote 4:As pointed out by Petitioner, the standard on law office failure is functionally equivalent to that when considering an application for leave to submit untimely objections.

Footnote 5:The Court has also considered the time-period in which the motion has been pending and the fact that the Petitioner has active Letters for which, based on representations by counsel, she is using the Letters to marshal assets of the estate. The Court notes that the parties have agreed to abide by the Court's direction that no distribution of assets be made until a further order of this Court.

Footnote 6:Mr. Cafarelli is an attorney duly admitted to practice law in the State of New York, and was so admitted at the time the Will was executed.

Footnote 7:This is incorrectly transcribed as "prepare" in the transcript. A review of the Court's FTR audio reveals that the question posed, was "declare". This is at 2:17:37PM in the FTR recording.

Footnote 8:The undersigned will not set forth the entirety of the testimony that is germane to this decision as the same is preserved in the record.

Footnote 9:As indicated, Objectant has raised sufficient factual issues with this potential objection for it to be preserved.

Footnote 10:The errors in the Affidavits of Attesting Witnesses After Death are deemed by the Court to be attorney scrivener errors and have no effect on the substance of the information contained therein as the same relates to the Will execution ceremony, especially in light of the testimony given at the §1404 hearing.

Footnote 11:Contrast these circumstance with the result in Matter of Kindberg, 207 NY 220 [1912], where the unrelated lawyer got the bulk of the estate under the will he drafted.