# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 50  SSM 35
In the Matter of Luis Alvarez,
         Appellant,
        v.
Anthony J. Annucci, &c.,
         Respondent.

Submitted by Jan Hoth, for appellant.
Submitted by Blair J. Greenwald, for respondent.

MEMORANDUM:

Order insofar as appealed from, as limited by the submissions, should be affirmed, without costs.

Petitioner pleaded guilty to sexual abuse of a child under the age of thirteen and was designated a sexually violent offender, sentenced to three years' imprisonment and seven years' postrelease supervision, and ultimately adjudicated a level one sex offender under the Sex Offender Registration Act.  In this CPLR article 78 proceeding seeking a writ of

mandamus to compel, petitioner has not established a clear legal right to relief. The residency restriction of the Sexual Assault Reform Act (SARA) applies equally to eligible offenders released on parole, conditionally released, or subject to a period of postrelease supervision.

When interpreting statutes, the clearest indicator of legislative intent, and "the starting point in any case of interpretation[,] must always be the language itself, giving effect to the plain meaning thereof" (*People ex rel. McCurdy v Warden, Westchester County Corr. Facility*, 36 NY3d 251, 257 [2020] [internal quotation marks omitted]). Moreover, "[c]ourts must harmonize the various provisions of related statutes and [] construe them in a way that renders them internally compatible" (*id.* [internal quotations omitted]). Here we again apply these well-established principles of statutory interpretation to determinations of SARA's application (*see e.g. People ex rel. Negron v Superintendent, Woodbourne Corr. Facility*, 36 NY3d 32, 34 [holding that the SARA residency restriction applies "only for those level three sex offenders serving a sentence for an enumerated offense"]).

In 1998, the legislature enacted the Sentencing Reform Act, amending the Penal Law to largely "abolish parole" for most felony offenses, including serious sexual offenses, and institute determinate terms of imprisonment to be followed by periods of postrelease supervision (*People v Williams*, 14 NY3d 198, 206 [2010]; *see* L 1998, ch 1). The reforms were intended to reduce crime and make communities safer by imposing stricter penalties on violent felony offenders (*see McCurdy*, 36 NY3d at 263-264; Governor's Approval

Mem, Bill Jacket, L 1998, ch 1, at 5; Assembly Bill Jacket, L 1998, ch 1, at 7). In this context, the legislature added Penal Law § 70.45 (3)—entitled "[c]onditions of post-release supervision"—which provides that the Board of Parole "shall establish and impose conditions of post-release supervision in the same manner and to the same extent as it may establish and impose conditions in accordance with the executive law upon persons who are granted parole or conditional release." Further, Penal Law § 70.40 was amended to add references to postrelease supervision; namely Penal Law § 70.40 (1) (b) provides that "conditions of release including those governing postrelease supervision, shall be such as may be imposed by the [Parole Board] in accordance with the provisions of the executive law."

Two years later, the Legislature enacted SARA to better protect the public, and especially children, from sex offenders determined to pose the most risk (*see* Budget Report, Bill Jacket, L 2000, ch 1, at 1-2; Attorney General's Mem, *id.* at 5-7). The SARA residency restriction bars offenders convicted of certain sex offenses from residing within 1,000 feet of a school (*see* Executive Law § 259-c [14]; Penal law § 220.24 [b]; *People v Diack*, 24 NY3d 674, 682 [2015]). Specifically, it provides that, when certain offenders are "released on parole or conditionally released pursuant to subdivision one or two of this section," the Parole Board "shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in [Penal Law § 220.00] or any other facility or institution

primarily used for the care or treatment of persons under the age of [18]" while such minors are present, with exceptions not relevant here (Executive Law § 259-c [14]).

Penal Law §§ 70.45 (3) and 70.40 (1) (b), when read together with SARA, mandate that the SARA residency restriction be applied equally to offenders released on parole, conditional release, or subject to a period of postrelease supervision. Section 70.45 (3) expressly requires that the Parole Board place conditions on postrelease supervision "in the same manner and to the same extent" as for parole and conditional release in accordance with the Executive Law (Penal Law §§ 70.45 [3], 70.40 [1] [b]). Furthermore, Executive Law § 259-c (2) gives the Parole Board "the power and duty of determining the conditions of release of the person who may be presumptively released, conditionally released[,] or subject to a period of postrelease supervision under an indeterminate or determinate sentence of imprisonment" (Executive Law § 259-c [2]).

Thus, a comprehensive reading of the statutory scheme rebuts the dissent's claim that the omission of any reference to postrelease supervision in subdivision (14) of Executive Law § 259-c "must be deemed deliberate" (dissenting op at 10). The dissent itself references Executive Law § 259-c (2) in support of its point (dissenting op at 7 n 4), the very place where postrelease supervision is mentioned in conjunction with conditional release and parole, plainly giving the Parole Board "the power and duty" to determine the conditions of release for each of these categories. Moreover, the dissent's conclusion that this reading of the statutes results in an absurdity because the legislature must have intended more lenient treatment for sex offenders who serve their full carceral sentences,

as opposed to those given early release, is belied by the fact that Penal Law § 65.10 (4-a) requires imposition of the same residency restriction on sex offenders whose sentences consist only of community supervision, namely probation and conditional discharge.

This Court has previously recognized that the "residency requirement is 'a mandatory condition of postrelease supervision for sex offenders subject to SARA" (*McCurdy* 36 NY3d at 262, quoting Executive Law § 259-c [14]; *see People ex rel. Johnson v Superintendent, Adirondack Correctional Facility*, 36 NY3d 187, 200 [2020]; *Matter of Gonzalez v Annucci*, 32 NYd 461, 466, 473 n 5 [2018]; *Diack* 24 NY3d at 681). The conclusion we reach today is the result of a plain reading of a statutory scheme enacted as part of a comprehensive and multiyear legislative effort to place more stringent restrictions on certain sex offenders living in the community. The only issue before us is the legislature's intent to impose the SARA residency restriction on certain convicted sex offenders while subject to postrelease supervision. Despite policy objections raised by the dissent—and the rhetoric aimed at the majority—courts may not "legislate under the guise of interpretation" (*People v Finnegan*, 85 NY2d 53, 58 [1995]).

WILSON, J. (dissenting):

"When the statutory language is clear and unambiguous, it should be construed so as to give effect to the plain meaning of the words used" (*People v Pabon*, 28 NY3d 147, 152 [2016]). Where "the legislative language is clear, [we have] no occasion [to]

examin[e]. . . extrinsic evidence to discover legislative intent" (*Makinen v City of New York*, 30 NY3d 81, 85 [2017]). To our longstanding, bedrock canon of statutory interpretation, the majority's brief memorandum adds the coda: "except when it comes to sex offenders." The plain text of the Sexual Assault Reform Act of 2000 ("SARA") provides that the residency restrictions prohibiting people convicted of certain sex offenses from living within 1,000 feet of school grounds applies only to those "on parole or conditionally released" – no one else (Executive Law § 259-c [14]). Mr. Alvarez was not released on parole; he was not conditionally released. SARA does not include sex offenders who, like Mr. Alvarez, have completed their prison terms and who are released on post-release supervision. This Court has interpreted SARA far beyond its original purpose, arguably beyond the bounds of the Constitution, and today, beyond its text. Because I cannot agree that the legislature intended this result, I dissent.

I.

Both petitioner Luis Alvarez's crime and his travails following the completion of his prison sentence are of a kind too familiar to our courts. After pleading guilty in 2016 to one count of sexual abuse in the first degree (Penal Law § 130.65 [4]) for having sexually assaulted a minor under the age of 13 when he was 35-years-old, Mr. Alvarez was sentenced to 3 years' incarceration and 7 years' post-release supervision (PRS).[1] Mr. Alvarez's sentence included a conditional release date at which, for good behavior, he

---

[1] His sentence ran concurrently with a 1-year term of incarceration for a misdemeanor fourth-degree weapons possession plea under a separate indictment, also in 2016.

could be released before serving his full time, and a maximum expiration date, at which point he would have completed his full prison term and would be released to the remainder of his sentence – in his case, 7 years of PRS. His conditional release date was April 29, 2017. Mr. Alvarez was not released on that date. His maximum expiration date was October 5, 2017. On October 5, 2017, when he could no longer legally be held in prison, nothing happened. Thus began Mr. Alvarez's wait to leave prison after his sentence of incarceration had ended. He was finally released from prison in June 2018, more than half a year beyond the date of his sentence of imprisonment.[2]

Months earlier, Mr. Alvarez had been adjudicated a Level I Sex Offender under the Sex Offender Registration Act ("SORA"), indicative of his low risk of re-offense. The Board of Parole imposed various conditions on him for his PRS, including the SARA residency restriction. Prior to his release, Mr. Alvarez indicated his preference to leave prison and seek residence in a shelter in New York City. However, Mr. Alvarez was instead transferred to Fishkill Correctional Facility, an institution whose name obscures its status as a prison, although Mr. Alvarez was ordered confined in Fishkill in its pseudonymous title of "residential treatment facility" (RTF) (Penal Law § 70.45 [3]).

When he was not timely released, Mr. Alvarez filed this article 78 petition seeking his release from Fishkill and transfer to a genuine RTF or to approved housing, and assistance securing housing. In December 2017, Mr. Alvarez was transferred to

---

[2] Compared with petitioners in our recent cases, Mr. Alvarez's wait was short (*see e.g.*, *People ex rel. Johnson v Superintendent, Adirondack Correctional Facility*, 36 NY3d 187, 192-195 [2020] [detailing the additional years petitioners were held confined in prison RTFs before release to SARA-compliant housing]).

Queensboro Correctional Facility – another so-called RTF where he continued to live as an inmate without meaningful rehabilitative programming. Indeed, Queensboro refused to permit Mr. Alvarez to participate in RTF programming because he had been convicted of a sex offense. Mr. Alvarez continued to challenge the lawfulness of his confinement, achieving transfer of venue to Queens County and filing two supplemental petitions for his release in which he argued that Queensboro, like Fishkill, was a prison – not a genuine treatment facility.

Mr. Alvarez also contended that he could not lawfully be kept confined for failure to secure SARA-compliant housing because SARA's residency restrictions do not apply to him. He argued that having served his full prison term, he was neither subject to parole nor conditional release – the two groups of people leaving prison to whom SARA's restrictions apply. Mr. Alvarez was held six more months before finally being released. He left Queensboro not yet having had an opportunity for a court to determine his legal claims.

It was only after he was released that his case was heard in Supreme Court. That court dismissed his petition. Mr. Alvarez appealed, arguing again that the prisons to which he was transferred were not residential treatment facilities and that SARA did not apply to him or others released to PRS after serving their full prison terms. The Appellate Division affirmed (186 AD3d 704 [2d Dept 2020]). The court rejected Mr. Alvarez's claim that SARA did not apply to him, explaining only that the claim was "without merit" (*id.* at 705-706).

We granted Mr. Alvarez leave to appeal (36 NY3d 911 [2021]) and the case was placed on the alternative review track under this Court's Rules (*see* Rules of Ct of Appeals

[22 NYCRR § 500.11]).[3] Before this Court, Mr. Alvarez presses a single argument: that SARA's residency restrictions do not apply to those individuals released to PRS who have completed their full prison terms.

## II.

The laws in New York governing individuals convicted of sex offenses after they leave prison are numerous: "Beginning with enactment of the Sex Offender Registration Act (SORA), the legislature has passed and the Governor has signed a series of laws regulating registered sex offenders, including the Sexual Assault Reform (SARA) in 2000 Act, the Sex Offender Management and Treatment Act (SOMTA) in 2007, and chapter 568 of the Laws of 2008 (chapter 568)" (*People v Diack*, 24 NY3d 674, 679 [2015]). Together, these laws form a web of rules, which, depending on how a person is released from prison and the relevant SORA risk level assigned, impose registration and notice requirements (Correction Law § 168-1 [6][f]); restrict access to the internet for social networking and

---

[3] These rules provide that appeals "may be selected" for the alternative review track, which permits only letter briefing without oral argument (22 NYCRR § 500.11 [c] [1]), when the cases present:

> "(1) Questions of discretion, mixed questions of law and fact or affirmed findings of fact. . . subject to a limited scope of review; (2) recent, controlling precedent; (3) narrow issues of law not of statewide importance; (4) unpreserved issues of law; (5) a party's request for such review; or (6) other appropriate factors" (22 NYCRR § 500.11 [b] [1]).

This case, which presents a fully preserved matter of first impression with implications for all persons convicted of qualifying sex offenses meets none of those criteria. Mr. Alvarez, understandably, objected to the relegation of his case to the alternative review procedure; the Attorney General did not disagree.

other purposes (Executive Law § 259-c [15]); and may require confinement in secure treatment facilities (SOMTA, L 2007, ch 7; Mental Hygiene Law §§ 10.03 [3]), among other restrictions and regulations of everyday life.

As to prison sentencing and release, there are four categories of release for which individuals are eligible depending on if their sentence is "definite" or "indefinite:" presumptive, conditional, parole, and post-release supervision (Executive Law § 259 [2]; Penal Law §§ 70.45 [3]). Individuals sentenced to determinate sentences, like Mr. Alvarez, must serve a minimum amount of time after which they may (though need not) be "conditionally released. . . when the total good behavior time allowed to him or her. . . is equal to the unserved portion of his or her term, maximum term, or aggregate maximum term" (Penal Law § 70.40). Conditional release is a statutory term of art – it does not mean released with conditions, but rather that a person has secured early release based on accumulated "good time" credits (Penal Law § 70.40 [b]). Parole, like conditional release, is discretionarily awarded before a full carceral sentence has been finished (*Silmon v Travis*, 95 NY2d 470, 476-477 [2000]; Executive Law § 259-I [2] [c] [a]). By contrast, PRS is a mandatory element of a determinate sentence that must be served following a term of incarceration (Penal Law § 70.45 [1]). Accordingly, when individuals leave prison, they may be released on parole or "presumptively released, conditionally released or subject to a period of post-release supervision" subject to conditions of release set by the Parole Board (Executive Law § 259-c [1], [2]). The Executive Law distinguishes between those

released conditionally, to PRS, presumptively, and on parole in elaborating the duties and

authority of the Parole Board throughout section 259-c.[4]

The subsection at issue – Executive Law § 259-c (14) – requires the Parole Board

to make mandatory as a condition of release for qualifying individuals a restriction on their

knowing entry onto school grounds. That section provides:

> "[N]otwithstanding any other provision of law to the contrary, where a person serving a sentence for an offense defined in article one hundred thirty-five or two hundred sixty-three of the penal law or section 255.25, 255.26 of the penal law and the victim of such offense was under the age of eighteen at the time of such offense or such person has been designated a level three sex offender pursuant to subdivision six of section one hundred sixty-eight-I of the correction law, *is released on parole or conditionally released* pursuant to subdivision one or two of this section, the board shall require, as a mandatory condition of such release, that such sentenced offender shall refrain from knowingly entering into or upon any school grounds, as that term is defined in subdivision fourteen of section 220.00 of the penal law, or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen while one or more of such persons under the age of eighteen are present" (Executive Law § 259-c [14] [emphasis added]).

---

[4] Section 259-c (1) for example, provides the Parole Board the "power and duty of determining which incarcerated individuals" may be *paroled* "and when and under what conditions" (Executive Law § 259-c [1]). Subsections 2 and 16, by contrast, give the Parole Board the authority to determine conditions of release for those who are "presumptively released, *conditionally released or subject to a period of post-release supervision*" and to determine "which incarcerated individuals serving a definite sentence of imprisonment may be conditionally released" (Executive Law § 259-c [2] [emphasis added], [16]). Meanwhile, subsection 12 provides for the consideration of a graduated sanctions program for "*all incarcerated individuals* released on community supervision" and subsection 15-a specifies that only individuals released on "parole or conditional release" must maintain specific devices in vehicles they may own or operate after release (259-c [12], [15-a]).

Penal Law § 220.00 defines the term "school grounds" to include not just any "building, structure, athletic playing field, playground or land contained within the real property boundary line" of a school but also "any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school" (Penal Law § 220.00 [14]). Areas "accessible to the public" includes "sidewalks, streets, parking lots, parks, playgrounds, store and restaurants" (Penal Law § 220.00 [14]).[5] Thus, the restriction enacted in Executive Law 259-c (14) has been interpreted to "creat[e] a residency restriction prohibiting certain classes of sex offenders from living within 1,000 feet of a school" whose "practical effect is that any sex offender who is subject to the school grounds mandatory condition is unable to reside within 1,000 feet of a school or facility as defined" (*Diack*, 24 NY3d at 681). The question in this case is one of pure statutory interpretation: to whom, or to what class of person released after a prison term for a qualifying offense, does this restriction apply?

## III.

In interpreting the statute, our "primary consideration. . . is to 'ascertain and give effect to the intention of the legislature'" (*Riley v County of Broome*, 95 NY2d 455, 463

---

[5] DOCCS has interpreted the clause of Executive Law § 259-c (14) "any school grounds. . . or any other facility or institution primarily used for the care or treatment of persons under the age of eighteen" to prohibit residence within 1,000 feet of child care facilities (*Johnson,* 36 NY3d at 234 n 5 [Wilson, J., dissenting]). DOCCS has applied this policy to institutional and private, home-based daycares alike, preventing people to whom the residency restriction applies from residing in the same apartment building in which a child care facility is housed, even if that facility is a private apartment and the person would be rejoining a close family member, such as, in one case, the person's daughter and mother (*id.* at 238).

[2000], *quoting* McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a], at 177). Our analysis begins and ends with the text, which is the "clearest indicator of legislative intent" (*Matter of New York County Lawers' Assn. v Bloomberg*, 19NY3d 712, 721 [2012]). "As a general rule, the statute's plain language is dispositive" (*Daimler Chrysler Corp v Spritzer*, 7 NY3d 653, 660 [2000]). Indeed, when a statute's language "is clear and unambiguous, courts must give effect to its plain meaning" (*Matter of M.B.*, 6 NY3d 437, 447 [2006], quoting *Matter of Tall Trees Constr. Corp. v Zoning Bd. of Appeal of Town of Huntington*, 97 NY2d 86, 91 [2001]; *see also People ex rel. Negron v Superintendent, Woodbourne Correctional Facility*, 36 NY3d 32, 36 [2020] [same] quoting *State of New York v Patricia II.*, 6 NY3d 160, 162 [2006]; McKinney's Cons Laws of NY, Book 1, Statutes § 94 ["The language of an enactment should be given its plain meaning. . . and [a] court should neither limit nor extend plain language"]).

The only plain reading of the unambiguous text of Executive Law § 259-c (14) is that it requires the Parole Board to "require, as mandatory conditions of such release" the restriction from entering school grounds for people with qualifying convictions who are "released on parole or conditionally released" (Executive Law § 259-c [14]). Thus, because people released on PRS after serving their full terms in prison are not on parole or conditionally released, section 259-c (14) does not impose the residency restriction as a mandatory condition of PRS release.

The longstanding interpretive maxim of *expressio unius est exclusion alterius* supports this understanding of section 259-c (14) (*see Matter of Bonnaffe*, 23 NY 169, 177 [1861] [describing the canon as "a sound and familiar maxim"]). "Where a law expressly

describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded" (*Town of Riverhead v N.Y. State Bd. of Real Prop. Servs.*, 5 NY3d 36, 42-43 [2005], *quoting* McKinney's Cons Laws of NY, Book 1, Statutes § 240, Comment at 411-412). Here, the statute expressly names two of the three types of community supervision – parole and conditional release (Executive Law § 259-c [14]). It does not name PRS; thus, we are compelled to conclude that the exclusion of PRS was intentional. Myriad decisions emphasize that the legislature knew how to use other words when it meant to do so and the absence of those words must be deemed deliberate (*see e.g. People v Page*, 35 NY3d 199, 206-207 [2020] ["Here, if (the statute) were intended to refer to *all* CPB agents, including those employed with air and marine operations, the Legislature would not have used the term 'Border Patrol' as a qualifier in the statutory text"] [emphasis in original]; *Kimmel v State of New York*, 29 NY3d 386, 394, 397 [2017] [rejecting an additional exception not included in the text of a statute]; *Diegelman v City of Buffalo*, 28 NY3d 231, 237 [2016] [refusing to read into a statute an exception the legislature did not include in the text of the law]; *Commonwealth of the N. Mariana v Canadian Imperial Bank of Commerce*, 21 NY3d 55, 62 [2013] ["we cannot read into the statute that which was specifically omitted by the legislature"]). Regard to the way the legislature structured Parole Board authority in section 259-c (14) according to the different types of release, referring throughout the section to "parole," "conditional release," "presumptive release," and PRS by name, only bolsters the conclusion that had the legislature intended to apply the residency restriction of subsection 14 to individuals who are released on PRS, it would have done so (*see* n 4, *supra*). Indeed,

that interpretive canon carries more force when a statute is carefully drafted and considered, and the specific and careful choice of terms throughout section 259-c show it is one such statute (*Behan v People*, 17 NY 516, 520-521 [1858]).

Yet another canon supports the plain text reading. "[A] statute should be construed to avoid rendering any of its provisions superfluous" (*Kimmel*, 29 NY3d at 393; *see also People v Bac Tran*, 80 NY2d 170, 176 [1992] [rejecting a reading of a statute that would render an important word "useless or superfluous"]; *Rodriguez v Perales*, 86 NY2d 361, 366 ["It is well settled that in the interpretation of a statute we must assume that the Legislature did not deliberately place a phrase in the statute which was intended to serve no purpose and each word must be read and given a distinct and consistent meaning"], quoting *Matter of Smathers*, 309 NY 487, 495 [1956]; *see also Jarecki v G.D. Searle & Co.*, 367 US 303, 307-308 [1961] ["The statute admits a reasonable construction which gives effect to all of its provisions. In these circumstances we will not adopt a strained reading which renders one part a mere redundancy"]). The majority's interpretation of Executive Law § 259-c (14) collapses two categories of release – conditional release and PRS, effectively holding that all those "released" with qualifying convictions and age of victim are subject to SARA's residency restriction. Doing so renders the term "conditionally" superfluous in section 259-c (14). That interpretation is particularly improper where, as here, the legislature has, in other sections of 259-c, used the terms "conditionally released" and PRS as separate categories in a list, referring to those "presumptively released, *conditionally released or subject to a period of post-release supervision*" in section 259-c (2) (Executive Law § 259-c [2] [emphasis added]; *see also*

*Babbit v Sweet Home Chapter of Communities for a Great Oregon*, 515 US 687, 688 [1995, Scalia, J.] [refusing to read a word listed among others so as to "deny[] it independent meaning"]).[6]

Despite its purported focus on the text of Executive Law § 259-c (14), the majority pauses only briefly to note the wording of the statute. Instead, with no arguments to dispute the plain text analysis above and no citation to interpretive canons or, indeed, any case in which our Court has so interpreted a statute, the majority focuses on two sections of the Penal Law: Penal Law §§ 70.45 (3) and 70.40 (1) (b). A fuller rendition of the text of both sections of the Penal Law is illustrative. The Sentencing Reform Act of 1998, which created PRS, amended Penal Law § 70.40 (1) (b) to provide that "the conditions of release, including those governing post-release supervision, shall be such as may be imposed by the state board of parole in accordance with the provision of the executive law" (Penal Law § 70.40 [1] [b]). Penal Law § 70.45 (3) is similar: "The board of parole shall establish and impose conditions of post-release supervision in the same manner and to the same extent as it may establish and impose conditions in accordance with the executive law upon persons who are granted parole or conditional release" (Penal Law § 70.45 [3]). Those

_____

[6] The majority correctly notes that section 259-c (2) authorizes the Parole Board to establish the conditions of release for those on "presumptively released, conditionally released or subject to a period of post-release supervision" (Executive Law § 259-c [14]; majority op at 4). The Parole Board's authority to impose conditions of release for those enumerated in section 259-c (2), which by the text includes those on PRS, is not contested. Rather, this case relates to a limitation on the Parole Board's discretionary authority, as abrogated by subsections such as 259-c (14) and 259-c (15), which require the Board to impose *mandatory* conditions on certain individuals. Thus, again, it is the language of Executive Law § 259-c (14) at issue for interpretation and no other.

sections establish that the Parole Board must ("shall") establish and impose conditions of PRS, just as the Board must for those released on parole or conditionally released, in accord with the Executive Law, or otherwise stated within its limits. Thus, the relevant analysis in is not these harmonizing statutes, but the substance of the Executive Law and which conditions it makes mandatory, as opposed to discretionary, and for whom.

Furthermore, the Executive Law's text specifies that its terms – and no others – govern the imposition of SARA's school grounds restriction. The legislature directed that section 259-c (14)'s terms apply "[n]otwithstanding any other provisions of law to the contrary" (Executive Law § 259-c [14]). The use of the term "notwithstanding" in contract or statute signifies the intent to "preempt any other potentially conflicting statutes, wherever found in the State's laws" (*People v Mitchell*, 15 NY3d 93, 97 [2010]; *CNH Diversified Opportunities Master Account, L.P. v Cleveland Unlimited, Inc.*, 36 NY3d 1, 16 [2020] ["When a preposition such as 'notwithstanding any other provision' is included in a contractual provision, that provision overrides any conflicting provisions in the contract"]). As such, even were other sections of the Penal Law in conflict with section 259-c (14) – which they are not – the section's use of the term "notwithstanding" signals a clear intent to displace any conflicting provisions of law.

Given the clarity of the "literal language" of the statute, we have no cause to deviate from its meaning "unless the plain intent and purpose of [the] statute would otherwise be defeated" or otherwise lead to "an unreasonable or absurd application of the law" (*Lynch*, 35 NY3d at 523, quoting *Matter of Anonymous v Molik*, 32 NY3d 30, 37 [2018]; *People*

*ex rel. McCurdy v Warden*, 36 NY3d 251, 262 [2020], quoting *Lubonty v U.S. Bank NA*, 34 NY3d 250, 255 [2019]). Reading the statute as written neither defeats SARA's purpose nor produces absurd results. SARA, which changed, created, and repealed innumerable provisions in the Penal Law, Executive Law, Public Health Law, and Criminal Procedure Law, does not have an express stated purpose (L 2000, ch 1). However, the limited legislative history suggests the purpose of the law is to "increase[] penalties against sex offenders, enhance[] sexual assault victim services, and close[] existing loopholes related to sex crime prosecution" (Budget Report on Bills, Bill Jacket, L 2000, ch 1). To that end, the Bill Jacket connects the increased period of incarceration "and probation supervision for sex offenders" to a broad "effort to better protect the public" (Budget Report on Bills, Bill Jacket, L 2000, ch 1).[7] The Attorney General's office describes this approach as "comprehensive" and "balanced" (Mem of NY Attorney General, Bill Jacket, L 2000, ch 1). The plain text interpretation of the law would leave section 259-c (14), as written, fully

---

[7] Notably, SARA's legislative history does not clearly evince intent to restrict the residency of qualifying individuals released to PRS. At best, the legislative history is contradictory. The Attorney General's memorandum in support states: "child sex offenders under post-release supervision, parole or probation would be prohibited, with limited exceptions, from being present on any school grounds" (Mem of the Attorney General, Bill Jacket, L 2000, ch 1). However, another submission states the school grounds provision would only apply to "certain probationers and parolees" (Mem of Department of Health, Bill Jacket, L 2000, ch 1). Moreover, "[w]here the words of a statute are free from ambiguity and express plainly, clearly and distinctly the legislative intent, resort may not be had to other means of interpretation" (McKinney's Cons Laws of NY, Book 1, Statutes § 76; *Lloyd v Grella*, 83 NY2d 537, 545-546 [1994] ["When the language of a statute is clear, effect should be given to the plain meaning of the words used. . . . In such instances, the court should look no further than unambiguous words and need not delve into legislative history"]).

in effect – those with qualifying convictions and ages of victim, or those adjudicated level three sex offenders, who are released on parole or conditionally released would remain subject to SARA's residency restrictions. Thus, the legislature's careful and "balanced" determination of who would be subject to the residency restriction, as discerned through the text of the law – the best evidence of legislative intent, is respected by application of the statute as written.

Although a majority of this Court may believe that the application of SARA's residency restriction would *further* support the purpose of SARA and better protect New York children, that determination lies squarely in the hands of the legislature. Indeed, when a statute is framed in "language so plain that an attempt to construe [it] is superfluous" a court's attempt to construe or interpret the statute as creatively as the majority has done here, "usurp[s] the power of legislation" and constitutes "trespasses by a court upon the legislative domain" (McKinney's Cons Laws of NY, Book 1, Statutes §§ 73, 76 ["The courts in construing statutes should avoid judicial legislation; they do not sit in review of the discretion of the Legislature or determine the expediency, wisdom, or propriety of its actions on matters within its powers"]; *see also Matter of Rathscheck's Estate*, 300 NY 346, 350 [1950] ["It is not allowable to interpret what has no need of interpretation, and when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning"] quoting *McCluskey v Cromwell*, 11 NY 593, 601 [1854]). As the United States Supreme Court has observed: "No legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative

choice – and it frustrates, rather than effectuates, legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be law" (*Rodriquez v United States*, 480 US 522, 525-526 [1987] [emphasis in original]). Thus, the majority's application of the SARA school-grounds restriction to those released to PRS, who are not contemplated in the statute's plain terms, exceeds the authority of this Court, intrudes on the legislature's policy making role, and more likely frustrates, rather than furthers, the law's balanced purpose.

In support of that extra-textual interpretation of the Executive Law, the majority cites to prior cases in which the application of section 259-c (14) to such individuals was neither discussed nor challenged. In *McCurdy*, we noted that no party disputed the application of the residency restriction – thus, the Court certainly did not hold that the residency restriction applied to individuals released to PRS after completing their term of incarceration (36 NY3d at 254). Similarly, in *Gonzalez*, the Court assumes in a footnote that residency restriction was mandatory for the petitioner released to PRS, but the petitioner had not challenged the condition's application and any discussion of the residency restriction's application was dicta (*Matter of Gonzalez v Annucci*, 32 NY3d 461, 473 n 5 [2018]). The Court in *Diack*, a preemption case, again only spoke on the issue as dicta (24 NY3d 674, 682 [2015] [holding residency local laws preempted by state law after finding intent to occupy the field of sex offender residency regulation]).

Whatever our prior statements, they were unnecessary and tangential to the holdings of those cases, and, as *dicta*, are neither authoritative nor binding on this Court – a point the majority does not refute. "*Dicta* are opinions of a judge which do not embody the

resolution or determination of the court, and made without argument, or full consideration of the point, are not the professed deliberate determinations of the judge" (*Rohrbach v Germania Fire Ins. Co.*, 62 NY 47, 58 [1875]). Indeed, the harmful results of dicta disguised as or argued to be holding can only be "neutralized" by the next court's recognition "of the prior dictum as nonbinding and go[ing] on to grapple with and decide the issue" (*Matter of Estate of Lewis*, 25 NY3d 456, 464-465 [2015] [Pigott, J., concurring] quoting Pierre N. Laval, Madison Lecture, *Judging Under the Constitution: Dicta About Dicta*, 81 NYU L Rev 1249, 1268-1269 [2006]). This Court has not hesitated to disregard and find mistaken its dicta in the past – it should do so again now (*see e.g.*, *Knapp v Hughes*, 19 NY3d 672, 643 [2012] ["We conclude, however, that this and similar dictums were mistaken and should not be followed"]).

Because giving effect to the plain language of Executive Law § 259-c (14) would not defeat the law's purpose and is not compelled by precedent, we must only disregard the plain language if it would produce absurd results. The Attorney General argues that it would be absurd to allow people who complete their full prison terms to reenter society (on PRS) without strict residency restrictions but to apply the restriction to those who show such good behavior and indicia of rehabilitation as to merit leaving prison before their term has ended. That argument ignores both principle and reality.[8]

---

[8] The majority misreads my argument that we should not deviate from the unambiguous language of the statute unless the plain text reading renders absurd results. My point is giving effect to the plain language of Executive Law § 259-c (14) does no such thing, calling into question the majority's reliance on legislative history and statutes beyond the text at issue. The majority's reading of the statutes does not produce an absurd result, just one that is unsupported by interpretive canons or the text of the Executive Law.

In principle, a judicially determined term of incarceration must have meaning. Thus, a person who has not yet finished a term of incarceration but is released early for whatever reason – even good behavior – has not had the same period of time necessary for punishment, rehabilitation and/or incapacitation, as judged by the sentencing court. Such a person has received, courtesy of the state, a benefit. By contrast, a person who has completed a full term of imprisonment has done exactly what was ordered by the sentencing court. The Appellate Division, describing people released on parole, has noted that they "are, in essence, convicted criminals who are released from prison before the expiration of their term, under supervision, and who are allowed to remain outside the penal institution only on stated conditions" (*People v Dyla*, 142 AD2d 423, 439 [2d Dept 1998]). Parole thus provides a means for early release. PRS, by contrast, provides a means for "reintegration" into a community *after* the prison element of a sentence has been completed (Bill Jacket, L 1998, ch 1). It is that fundamental difference in the purpose of parole and conditional release versus PRS that undergirds the careful treatment of each group in the text of Executive Law 259-c (*see People v Badji*, 36 NY3d 393 [2021] [noting that the legislature may generally treat two categories similarly (in that instance credit and debit cards) but still purposefully differentiate in their treatment by statute: "the fact is that they serve different purposes"]). In sum, it is hardly absurd to think that the legislature made a deliberate distinction between certain sex offenders granted the benefit of early release

(requiring them to stay away from schools) and those who served a full term of incarceration.[9]

The reality of SARA residency restrictions, as discussed in more depth below, makes the purported absurdity not only wrong in principle but unlikely in practice. The extreme difficulty of securing SARA-compliant housing means that many individuals who *are* eligible for good time, early parole, and conditional release are not able to secure approved housing in time to take advantage of those opportunities for early reentry. Instead, unable to locate or secure affordable and compliant housing, they remain incarcerated not just until their maximum expiration date, or the six month period after which DOCCS may mandatorily order a person to remain in a RTF, but for an indefinite period (*McCurdy*, 36 NY3d at 265 [Fahey, J., dissenting]). Thus, many individuals released from prison on PRS

---

[9] As the majority notes, SARA also imposed the school-grounds residency restriction on those sentenced to conditional discharge and probation (L 2000, ch 1, § 7; Penal Law § 65.10 [4-a]; majority op at 4-5). Contrary to the majority's view, however, the deliberate imposition of the residency restriction for, per Penal Law § 65.10 (4-a) and Executive Law § 259-c (14), those paroled, conditionally released, conditionally discharged, or on probation is readily understandable for the same reasons articulated above. Conditional discharge and probation do not involve any term of imprisonment and therefore do not receive the "extensive array of programs and services for incarcerated individuals to assist them in redirecting their lives and becoming productive, law-abiding members of society. Programs include guidance and counseling services, library and law library services, religious services, educational and vocational training, alcohol and substance abuse treatment, family development, and many others" (Department of Corrections and Community Supervision, Program Services, https://doccs.ny.gov/program-services [last accessed March 18, 2022]). As a result, persons sentenced to conditional discharge or probation are subjected to stringent, sometimes daily, reporting to probation officers and, generally, more state supervision and control (Penal Law § 65.10 [3] [a], [c]). Thus, like conditional release and parole, they represent an alternative to incarceration that necessarily involves risk of re-offense – the law imposes more stringent supervision, including the school-grounds restriction, as a result.

*may well* have qualified for early release but are prevented from leaving prison in practice due to the disfunction of the SARA residency restriction. It is to that general disfunction the Court adds today and to which I now turn.

IV.

It is especially difficult to justify the majority's extra-statutory reach when considering our recent holdings interpreting the school grounds restriction, that restriction's practical effect, and the role of PRS in sentencing today. Since SARA was enacted two decades ago, we have interpreted it several times. In *Gonzalez*, we held that DOCCS, which is required by statute to "assist" people eligible for release from prison to find housing, must only *approve* residences that incarcerated people themselves find and provide resources – usually simply access to a telephone – to facilitate their search (*Gonzalez*, 32 NY3d at 468; *Johnson*, 36 NY3d at 234 [Wilson, J., dissenting]; Correction Law § 201 [5]). Against the backdrop of the near impossibility of finding affordable SARA-compliant housing in urban areas like New York City, in which virtually no residences are located more than two blocks from a school, in *McCurdy*, the Court announced that the Penal Law, which expressly allows DOCCS to order as a term of release only a six month confinement in a residential treatment facility, in fact allows DOCCS to indefinitely confine, or in the Court's words "provide temporary housing in an RTF" (Fishkill prison, for example) to those individuals unable to secure SARA-compliant housing (36 NY3d at 239). Even a person who has accrued good time credits and is granted early release will remain in confinement until that person is able to secure an affordable SARA-compliant residence (*id.* at 209). Notably, although we have yet to pass on whether

prison RTF programs satisfy the legal description of "residential treatment facility," those confined to RTFs indefinitely experience few meaningful distinctions in their confinement from that of general incarceration (*Johnson*, 36 NY3d at 197 [Wilson, J., dissenting]). Nonetheless, in *Johnson*, decided the same day as *McCurdy*, the Court concluded that such indefinite incarceration does not unconstitutionally deprive individuals of their liberty (36 NY3d at 197). Otherwise stated, sex offenders eligible to leave prison to whom the school grounds residency restriction applies must somehow, without meaningful help, find compliant and affordable housing before their release date; if they fail to do so, they may be confined indefinitely; when such persons' prior life and family or support networks are in New York City, affordable compliant housing does not actually exist; and the continuing, indefinite confinement will mimic general incarceration in every meaningful way.

Today, the majority holds that despite the legislative exclusion of PRS, people with qualifying offenses released on PRS must play this dystopic game. The 1998 Sentencing Reform Act, of course, amended the Penal Law to require PRS with any determinate sentence, prescribing lengths ranging from 1 and a half to five years depending on the type of conviction (Penal Law § 70.45 [1], [2]; L 1998, ch 1, §15). Notably, PRS terms may range longer than five years "where the defendant is subject to indeterminate and determinate sentences" (Penal Law § 70.45 [1]). Indeed, in many cases PRS is as long or longer than the term of incarceration (*see e.g.*, *Gonzalez*, 32 NY3d at 466 [petitioner was sentenced to 2 and a half years' incarceration to be followed by 3 years' PRS]; *McCurdy*, 36 NY3d at 254 [petitioner was sentenced to 5 years' imprisonment to be followed by 5

years' PRS]). The Sentencing Reform Act also requires determinate sentences when an individual pleads guilty to a class D violent felony offense (L 1998, ch 1, § 9). Class D violent felonies include stalking (Penal Law § 120.60), rape in the second degree (Penal Law § 130.30), sexual abuse in the first degree (Penal Law § 130.65), among other offenses which, like these, result in the application of the SARA residency restriction so long as the victim was underage at the time of the offense or the person convicted is adjudged SORA risk level III (Executive Law § 259-c [14] [including all offenses detailed in article 130 of the Penal Law, among others]).

The combined effect of these statutes is that most, if not all, people convicted of sex offenses will have PRS. When understood in the context of SARA-compliant housing unavailability and our caselaw, the majority's holding serves functionally to extend the carceral sentences of multitudes of persons whose carceral sentences have expired – particularly so if they are unlucky enough to have made a home in or have family or support networks in New York City. That extended carceral sentence could equal if not surpass the person's original prison term. Though it has been recognized in dissents from our holdings and elsewhere, it cannot go without mention that these restrictions have no empirical proof of efficacy in preventing recidivism or violent crime and may prove counterproductive.[10]

---

[10] "[T]here is no empirical support for the effectiveness of residence restrictions. In fact, a number of negative unintended consequences have been empirically identified, including loss of housing, loss of support systems and financial hardship that may aggravate rather than mitigate offender risk" (Christopher Lobanov-Rostovsky, *Chapter 8: Sex Offender Management Strategies*, in U.S. Department of Justice, Office of Justice Programs, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, *Sex Offender Management Assessment and Planning Initiative* at 205 [NCJ 247059, Oct.

The troubling situation created by the SARA residency restriction will now be worse. The majority's holding finds no basis in the clear text of Executive Law § 259-c (14). I read the law to mean what it says: that the school grounds residency restriction applies to those "on parole and conditionally released" and by universally accepted longstanding canons of construction, no others. Because individuals who have completed prison terms and who are released to PRS are not on parole or conditionally released, and I cannot concur in this further judicial extension of SARA beyond its breaking point, I dissent.

On review of submissions pursuant to section 500.11 of the Rules, order insofar as appealed from as limited by the submissions affirmed, without costs, in a memorandum. Chief Judge DiFiore and Judges Garcia, Singas, Cannataro and Troutman concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs.

Decided March 22, 2022

---

2014], available at https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/somapi_full_report.pdf [last accessed March 16, 2022]; *see also Johnson*, 36 NY3d at 218 [Rivera, J., dissenting] [noting that "(c)ourts and scholars alike have recognized that residency restrictions do next to nothing to prevent children from being victims of sex crimes" and collecting court cases, journal articles, and government sources to that effect]; Allison Frankel, *Pushed Out and Locked In: The Catch-22 for New York's Disabled, Homeless Sex-Offender Registrants*, 129 Yale LJ Forum 279, 299 [2019] [explaining that the majority of people who commit registrable sex offenses, in one study, were first-time offenders, thus residency restrictions are not only ineffective at preventing non-stranger and intra-family offense, but they fail to address the bulk of sex offenses]).